Stacey H. Crawshaw, OSB #146074
Stacey.Lewis@pacificalawgroup.com
PACIFICA LAW GROUP LLP
401 Union St., Suite 1600
Seattle, WA 98101-2668
(206) 245-1700

Paul J. Lawrence*
Paul.Lawrence@pacificalawgroup.com
PACIFICA LAW GROUP LLP
401 Union St., Suite 1600
Seattle, WA 98101-2668
(206) 245-1700

*Attorneys for Plaintiff City of Salem*

*\* Pro Hac Vice application forthcoming*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| CITY OF SALEM, | No. |
| Plaintiff, | COMPLAINT |
| v. | |
| MARKWAYNE MULLIN in his official capacity as Secretary of the U.S. Department of Homeland Security; the U.S. DEPARTMENT OF HOMELAND SECURITY; ROBERT J. FENTON JR. in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; and the FEDERAL EMERGENCY MANAGEMENT AGENCY, | |
| Defendants. | |

COMPLAINT - 1

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I.    INTRODUCTION

1.    For more than 75 years, Congress has sought to ensure "an orderly and continuing means of assistance by the Federal Government to State and local governments" in addressing the suffering and damage caused by disasters. 42 U.S.C. § 5121(b); Federal Disaster Relief Act of 1950, Pub. L. 81-875, § 1, 64 Stat. 1109. Congress has directed the federal government to help states and local governments prepare for, reduce the risk of, and recover from disasters that cause "loss of life, human suffering, loss of income, and property loss and damage," "disrupt the normal functioning of governments and communities," and inflict severe distress on individuals and families. 42 U.S.C. § 5121(a); *see generally* Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended, 42 U.S.C. ch. 68.

2.    To that end, Congress has established the framework for a complex, multi-layered emergency-management infrastructure to prepare for, mitigate, and recover from disasters and emergencies. Congress has encouraged states and local governments to build that infrastructure in partnership with the federal government and has directed federal agencies to collaborate with willing states and local governments in carrying out those efforts.

3.    Congress supports that system through billions of dollars in federal grants each year for state and local governments. These grants fund a wide range of activities essential to public safety and community resilience, including disaster mitigation and preparedness, search-and-rescue operations, and recovery from disaster-related damage to public and private property. State and local governments depend heavily on this funding to carry out their emergency-management responsibilities and to absorb the substantial and often unanticipated costs disasters impose.

4.    Federal emergency-management funding is thus an essential pillar of the nation's disaster preparedness and recovery infrastructure. Without it, communities across the country

COMPLAINT - 2

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

would face greater risks of injury, death, and property loss from disasters, while state and local governments would face significant economic strain and diminished capacity to address the unique needs of the people they serve.

5.    Congress has largely entrusted the administration of these federal grant programs to the Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA"), a component of DHS. Although DHS and FEMA retain limited discretion over funding decisions, Congress has prescribed by statute many of the terms governing eligibility, allocation, and conditions for these funds.

6.    For the first time in the history of Congress's disaster-assistance grant programs, DHS and FEMA have sought to leverage this critical funding to advance policy objectives unrelated to the purposes for which Congress appropriated it. Specifically, DHS and FEMA have imposed or threatened to impose conditions on grant funding designed to coerce state and local governments into prohibiting all kinds of diversity, equity, and inclusion ("DEI"), facilitating federal civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

7.    Compounding these issues, DHS and FEMA have also asserted sweeping authority to terminate grants "for convenience," without meaningful standards or advance notice.

8.    By imposing conditions that Congress has not authorized and that even Congress could not constitutionally enact, DHS and FEMA have exceeded their lawful authority and encroached upon Congress's power of the purse. The challenged conditions bear no meaningful relationship to the purposes of the grant programs Congress established and violate bedrock separation of powers principles, the Spending Clause, and the Administrative Procedure Act ("APA").

COMPLAINT - 3

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

9.      DHS and FEMA's unlawful efforts to repurpose these congressionally authorized grant programs directly harm Plaintiff City of Salem ("Salem"). The challenged conditions place at risk more than $1 million in already-awarded disaster relief funding that Salem needs to repair critical facilities damaged in a federally declared disaster, as well as upcoming funding opportunities for disaster-management projects. If allowed to stand, these conditions would disrupt Salem's budgeting and operations and undermine its ability to determine for itself how to meet its community's needs. Salem therefore seeks an order declaring the challenged conditions unlawful, void, and unenforceable, and enjoining their imposition and enforcement.

## II.      JURISDICTION AND VENUE

10.      The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 et seq.

11.      Venue properly lies within the District of Oregon because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiff Salem resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e)(1). Divisional venue properly lies in the Eugene Division because Salem's seat of government where the grant agreements would be executed and one of the two proposed projects at issue are in that Division. LR 3-2.

## III.      PARTIES

12.      Plaintiff Salem is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Salem City Charter.

13.      Defendant Markwayne Mullin is the Secretary of DHS, the highest-ranking official in DHS, and is responsible for the decisions of DHS. He is sued in his official capacity.

COMPLAINT - 4

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

14.     Defendant DHS is an executive department of the United States government. 6 U.S.C. § 111(a). DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 701(b)(1).

15.     Defendant Robert J. Fenton Jr. is the Senior Official Performing the Duties of the FEMA Administrator, the highest-ranking official in FEMA, and is responsible for the decisions of FEMA. He is sued in his official capacity.

16.     Defendant FEMA is an agency within DHS. Congress has directed that FEMA is and must "be maintained as a distinct entity within" DHS. 6 U.S.C. § 316(a). FEMA is an "agency" within the meaning of the APA. 5 U.S.C. § 701(b)(1).

## IV.    FACTUAL ALLEGATIONS

### A.    Federal Funding for Disaster Preparedness, Mitigation, and Recovery.

17.     FEMA was established by executive order in 1979 as an independent executive agency to consolidate emergency preparedness, mitigation, and response activities, cut duplicative administrative costs, and strengthen the nation's ability to deal effectively with emergencies. *See* Exec. Ord. No. 12127, 44 Fed. Reg. 19367 (Mar. 31, 1979); *see also* Reorganization Plan No. 3 of 1978, 43 Fed. Reg. 41943, 92 Stat. 3788. FEMA initially had the dual mission of emergency management and civil defense. *See* Exec. Ord. No. 12148, 44 Fed. Reg. 43239 (Jul. 20, 1979).

18.     FEMA's responsibilities were further defined and expanded by the Disaster Relief and Emergency Assistance Amendments of 1988, Pub. L. 100-707, 102 Stat. 4689 (1988), which amended the Disaster Relief Act of 1974 and renamed it the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). The Stafford Act provided clear direction for emergency management and established the current statutory framework for disaster response and recovery through presidential disaster declarations.

COMPLAINT - 5

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

19.     Congress established DHS in the Homeland Security Act of 2002. *See* Pub. L. 107-296, 116 Stat. 2135 (2002); *see also* 6 U.S.C. § 111. Under that legislation, FEMA became an operational component of DHS, with its primary mission to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C. § 313(a), (b)(1).

20.     DHS administers both competitive and formula grant programs. Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019). Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up). DHS administers numerous disaster preparedness, mitigation, and recovery grants through FEMA. *See generally* 42 U.S.C. ch. 68 (authorizing a range of disaster relief federal assistance programs).

21.     Each year Congress appropriates billions of dollars for DHS, and primarily FEMA, to distribute as grants to state and local governments to support such disaster preparedness, mitigation, and recovery efforts throughout the United States.

22.     To the best of Salem's knowledge, nothing in the authorizing statutes or appropriations legislation imposes or authorizes directives for or conditions on DHS or FEMA grants related to prohibiting all kinds of DEI, facilitating federal civil immigration enforcement,

COMPLAINT - 6

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

23.    Salem, like virtually every state and local government across the country, relies on these federal grants to support its emergency-management functions.

24.    While FEMA makes some of its emergency-management grant funding available directly to local governments, it disburses most of the funding to the states, which are then authorized or required to execute subgrants to distribute the funding to local governments. This is known as "pass-through" grant funding. When it distributes such funding to states, FEMA typically disburses funds to the agencies within each state that FEMA refers to as the State Administrative Agency ("SAA") or the State Emergency Management Agency ("EMA"). FEMA grants contemplate this multi-layered, pass-through structure.

25.    Salem receives most, if not all, of its FEMA grant funding indirectly, as a subrecipient of funding from the State of Oregon. The SAA and EMA for Oregon is the Oregon Department of Emergency Management ("OEM").

26.    Salem has received or been awarded, or anticipates receiving or being awarded, subawards under the following grant programs administered by FEMA: the Public Assistance ("PA") Grant Program and the Building Resilient Infrastructure and Communities ("BRIC") Grant Program.

**1.  Public Assistance Grant Program.**

      **a.  Congress Authorizes the PA Grant Program Through the Stafford Act.**

27.    The Stafford Act as amended authorizes federal funding to state, local, tribal, and territorial governments to help communities quickly respond to and recover from presidentially-declared disasters and emergencies. *See* 42 U.S.C. §§ 5170-5193. States are the direct recipients

COMPLAINT - 7

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

for these PA grants, but the money regularly flows to local governments as subrecipients. *See* 44 C.F.R. §§ 206.201-206.208. Through the PA Grant Program, FEMA provides supplemental federal grant assistance for debris removal, life-saving emergency protective measures, and restoration of certain disaster-damaged facilities. The PA Grant Program also encourages protection of these damaged facilities from future incidents by providing assistance for hazard mitigation measures and code compliance.

28.     Under the applicable statutes, to apply for PA grant funding, the governor of a state requests a major disaster declaration or an emergency declaration from the President through FEMA. *See* 42 U.S.C. §§ 5170, 5191. For FEMA to provide PA funding, the President must declare that a major disaster or an emergency exists.

29.     The assistance FEMA provides through its PA Grant Program is subject to a federal cost share, which means that FEMA provides funding for a portion of the project and the recipient or applicant/subrecipient is responsible for the remaining portion. The federal share of assistance generally is not less than 75 percent of the eligible costs, but the minimum federal share can be increased above 75 percent in certain circumstances. *See* 42 U.S.C. §§ 5172(b), 5173(d), 5193(a).

30.     Nothing in the statutory provisions authorizing the PA Grant Program authorizes FEMA to impose PA grant conditions related to prohibiting all kinds of DEI, facilitating federal civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

### b. FEMA Promulgates Rules Governing the PA Program.

31.     FEMA has promulgated extensive rules governing PA grants. *See* 44 C.F.R. pt. 206. These rules govern the procedures for presidential declaration of major disasters and emergencies, *see id.* subpt. B; identify the forms of assistance available under emergency

COMPLAINT - 8

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

declarations, *see id*. subpt. C; and establish procedures for the administration of PA grants, s*ee* 44 C.F.R. pt. 206, subpt. G, as well as rules governing eligibility for such grants and allowable costs, *see id*., subpt. H.

32.    FEMA's rules applicable to PA grants describe the application process for PA funding. States are the "recipients" of the grants and are responsible for processing subgrants to "applicants," i.e., subrecipients, who apply for assistance as a result of a declaration of a major disaster or emergency. *See* 44 C.F.R. § 206.202. A state must send a completed "Request" for funding to its regional FEMA representative for each applicant requesting public assistance. *Id*. FEMA or the applicant then prepares a Project Worksheet for each project identifying the eligible scope of work and including a quantitative estimate for the eligible work. *Id*. Before FEMA provides funds to the state, the state must complete and submit an application for federal assistance and required assurances. *Id*. FEMA then obligates funds to the state based on the approved Project Worksheets, and the state will then approve subgrants based on the Project Worksheets approved for each applicant. *Id*.

33.    FEMA's rules applicable to PA grants provide that to be eligible for financial assistance, an item of work must be required because of the major disaster or emergency event, be located within the designated area of a major disaster or emergency declaration, and be the legal responsibility of an eligible applicant. 44 C.F.R. § 206.223. The rules establish other criteria for certain types of assistance. *See, e.g.,* 44 C.F.R. §§ 206.224-.226.

34.    FEMA's rules applicable to PA grants also require compliance with 44 C.F.R. part 7, "Nondiscrimination in Federally-Assisted Programs," which is FEMA's regulation effectuating the provisions of Title VI of the Civil Rights Act of 1964. *See* 44 C.F.R. § 206.11.

COMPLAINT - 9

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

35.    Nothing in FEMA's rules governing the PA grant program authorizes FEMA to impose PA grant conditions related to prohibiting all kinds of DEI, facilitating federal civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

### c.    Congress Appropriates PA Grant Funding.

36.    PA grants are paid out from the Disaster Relief Fund, an appropriation from which FEMA can direct, coordinate, manage, and fund eligible resources and recovery efforts associated with domestic major disasters and emergencies pursuant to the Stafford Act. Congress appropriated $29 billion to the Disaster Relief Fund in the American Relief Act of 2025, Pub. L. 118-158, 138 Stat. 1722, 1745 (2024). Other appropriations legislation similarly has appropriated funds to the Disaster Relief Fund for major disasters declared under the Stafford Act. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, 27-28 (2025); Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4459, 4742 (2022); Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49, 328-29 (2022).

37.    Salem is not aware of any appropriations legislation ever imposing or authorizing directives for or conditions on PA grants related to prohibiting all kinds of DEI, facilitating federal civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

### d.    Salem Was Awarded PA Grant Funding to Repair Critical Facilities Damaged During a Presidentially Declared Disaster.

38.    In December 2025, a series of storms in Western Oregon brought record rainfall, high winds, and an atmospheric river that caused widespread flooding, landslides, and mudslides. Oregon Governor Tina Kotek declared the flooding event a state of emergency in several Oregon counties. Or. Exec. Ord. No. 25-32 (Dec. 30, 2025); Or. Exec. Ord. No. 26-02 (Jan. 15, 2025).

COMPLAINT - 10

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

39.    "Regional impacts included downed trees and power lines from high winds, localized road closures from floodwaters and landslides, and associated infrastructure damages. More than 300,000 Oregonians were without power at the peak of the outages. Some areas were without power for over 4 days." Governor Tina Kotek, *Request for Presidential Disaster Decl. Cover Letter* at 4 (Feb. 18, 2026) (hereinafter "*Decl. Req.*"). https://www.oregon.gov/oem/Memos%20and%20Executive%20Orders/021826Dec25Storms_Gov%20-Letter-Request-Major-Disaster-Declaration.pdf.

40.    "Given the magnitude, duration, and widespread impacts of the December 2025 flooding, landslides, and severe storms," Oregon and its affected counties "exhausted available resources" responding to the events and "lack[ed] the capacity to manage recovery without federal assistance." *Id.* at 14.

41.    Consequently, Governor Kotek requested a federal declaration of emergency and requested FEMA relief under, among other things, the PA Grant Program. *Id.* Prior to the request, Oregon and FEMA conducted a Joint Preliminary Damage Assessment and validated $15,454,468 in estimated damages across the state. *Id.*

42.    FEMA announced President Trump's approval of Governor Kotek's request for a major disaster declaration on April 11, 2026. Press Release, FEMA, President Donald J. Trump Approves Major Disaster Declaration for Oregon (Apr. 11, 2026), https://perma.cc/B9QX-TYBF. Under the federal emergency declaration, PA grant funding was made available "for emergency work and the repair and replacement of facilities damaged by the severe storms, straight-line winds, flooding, landslides and mudslides in Clackamas, Hood River, Lane, Lincoln, Linn, Polk, Tillamook, Union and Yamhill counties." *Id.*

COMPLAINT - 11

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

43.    In Salem, the December 2025 flooding event caused catastrophic damage to three corrugated metal culverts and a critical roadway that provides access to the West Salem Pump Station, in turn compromising Salem's ability to meet its sewage treatment needs. The West Salem Pump Station transmits sewage from all of West Salem beneath the Willamette River to the Willow Lake Wastewater Pollution Control Facility, Salem's primary wastewater treatment facility. The pump station is accessed by a gravel road that crosses over Glenn Creek where flow is conveyed through three corrugated metal culverts. During the December 2025 flooding event, the culverts became plugged with gravel and debris, causing the flow to wash out the roadway and compromise access to the pump station.

44.    Governor Kotek's request for disaster relief specifically included the culvert damage affecting Salem: "Polk [C]ounty experienced heavy rains that overwhelmed stormwater systems, damaged roads and road systems, and deposited debris jurisdiction wide. A culvert crossing a fishbearing stream and road leading to a sewer pump station owned by the city of Salem was damaged by floodwaters and will trigger mandatory codes and standards upgrades upon repair." *Decl. Req.* at 8. She explained, "FEMA and the State were able to validate $1,003,348 in damages" for Polk County. *Id.*

45.    Salem cannot repair the culverts or simply remove the debris—they must be replaced, because the aged and deteriorated condition of the culverts makes it impossible to remove the obstructions from their entire length. Temporary access has been restored with steel plates to span the creek, but higher winter flows are likely to create further washouts, with potential severe weather conditions associated with a predicted 2026 El Nino event adding to the urgency of the project.

COMPLAINT - 12

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

46.     The full scope of this necessary infrastructure project includes removal of the existing culverts and replacement with a railcar bridge that will fully span the creek. Abutments and roadway embankment will be constructed to raise the elevation of the existing roadway for the new span. Salem has invested significant funds and employee-hours in scoping the project and applying for all necessary permits and approvals. Because the creek is fish-bearing, Salem must conduct environmental restoration work for improved fish passage as required by environmental permits for the work. Additionally, to avoid disrupting fish spawning seasons, work in the creek channel must be performed during the in-water work period that will be allowed by Salem's permits, July 1 through October 31, 2026.

47.     To obtain funds needed to complete the culvert replacement project, Salem submitted a request for PA grant funding to FEMA on May 4, 2026.

48.     On May 26, 2026, OEM notified Salem that its PA funding request was approved and transmitted a Grant Agreement for Salem's signature. OEM explained, "[e]xecution of the agreement by both the Oregon Department of Emergency Management (OEM) and the jurisdiction/subrecipient is required before any funding may be obligated or disbursed." Upon signing the Grant Agreement, Salem would gain access to $1,093,800 of federal funds to complete the culvert replacement project.

49.     The Grant Agreement incorporates the Fiscal Year (FY) 2025 Department of Homeland Security Standard Terms and Conditions ("FY25 DHS Standard Terms"),[1] with certain exceptions. As set forth in paragraphs 85 to 91 below, the incorporated terms include conditions related to prohibiting all kinds of DEI, prohibiting the "promot[ion]" of "gender ideology," and

---

[1] DHS, FY 2025 DHS Standard Terms and Conditions Version 3 (Apr. 18, 2025), https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf.

COMPLAINT - 13

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

adherence to executive orders unrelated to the purpose of the grant; the excepted terms include conditions related to facilitating federal civil immigration enforcement.

### 2. Building Resilient Infrastructure and Communities Grant Program.

#### a. Congress Authorizes the BRIC Grant Program Through the Stafford Act.

50. FEMA's Hazard Mitigation Assistance Program ("HMA") provides funding to state, local, tribal, and territorial governments to invest in long-term solutions that reduce and mitigate the impact of future natural disasters. FEMA groups several grants under HMA, including, as relevant here, the BRIC Grant Program.

51. States, federally recognized tribes, territories, and the District of Columbia are eligible to apply for HMA funding. Local governments apply as sub-applicants of their state. FEMA generally requires HMA applicants and sub-applicants to have a FEMA-approved Hazard Mitigation Plan in place as a condition of grant eligibility, but other eligibility criteria vary by grant. Each HMA grant requires a separate application.

52. FEMA established the BRIC grant program under authority granted in the Disaster Recovery Reform Act of 2018, an amendment to Section 203 of the Stafford Act which authorizes FEMA to "provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments." 42 U.S.C. § 5133(b); *see also* FEMA, Hazard Mitigation Assistance: Building Resilient Infrastructure and Communities, 87 Fed. Reg. 10805 (2022); Disaster Recovery Reform Act of 2018, Pub. L. 115-254, Div. D, 132 Stat. 3186, 3461-3463 (2018).

COMPLAINT - 14

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

53.     Recipients "must" use BRIC funds "principally to implement predisaster hazard mitigation measures that are cost-effective and are described in proposals approved by [FEMA]," and "may" use BRIC funds for specified purposes including to "support effective public-private natural disaster hazard mitigation partnerships," to "improve the assessment of a community's vulnerability to natural hazards," to "establish hazard mitigation priorities, and an appropriate hazard mitigation plan, for a community," or to "establish and carry out enforcement activities and implement the latest published editions of" relevant codes, specifications, and standards that incorporate the latest hazard-resistant designs and "establish minimum acceptable criteria" for design and construction of structures to protect against disasters. 42 U.S.C. § 5133(e)(1). Each grant generally can cover up to 75% of a project's costs. 42 U.S.C. § 5133(h).

54.     FEMA is required to award BRIC funds "on a competitive basis for mitigation activities that are cost effective and in accordance with" criteria established by Congress. 42 U.S.C. § 5133(f)(1). Those criteria include, among other things, the extent to which a proposed project will mitigate damage from natural disasters, its cost-effectiveness, the applicant's commitment to spending its own funds on disaster mitigation, and the extent to which the project "maximize[s] net benefits to society." *See* 42 U.S.C. §§ 5133(g).

55.     To ensure that the benefits would be widespread, Congress provided that any state that "received a major disaster declaration in the previous 7 years" is eligible for grants, required FEMA to grant a minimum amount of funding to communities in every eligible state each year, and placed an annual cap on the amount any one state can receive. 42 U.S.C. § 5133(f)(2), (g).

56.     Nothing in the statutory provisions authorizing the BRIC grant program authorizes FEMA to impose BRIC grant conditions related to prohibiting all kinds of DEI, facilitating federal

COMPLAINT - 15

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

### b. The BRIC Program Has Multiple Funding Sources.

57.     To fund the BRIC grant program, FEMA is authorized to set aside certain funds from the Disaster Relief Fund, which funds FEMA's post-disaster grants, into a dedicated National Public Infrastructure Predisaster Mitigation Fund. *See* 42 U.S.C. § 5133(c), (i). FEMA set aside funds for BRIC for fiscal years 2019 through 2025. *See* FEMA, Disaster Relief Fund: Monthly Report 17 (June 3, 2026), https://www.fema.gov/sites/default/files/documents/fema_ocfo_disaster-relief-fund-report-may_06052026.pdf (reflecting a 6% set-aside in the BRIC account for each fiscal year between 2019 and 2025).

58.     Congress also appropriated another $1 billion directly to the BRIC program as part of the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429, 1387 (2021). In doing so, Congress required FEMA to make at least $200 million available for grants for each of fiscal years 2022, 2023, 2024, 2025, and 2026, in addition to the amounts FEMA set aside for the National Public Infrastructure Predisaster Mitigation Fund. *See id*. (providing that "in addition to any amounts set aside pursuant to [42 U.S.C. § 5133(i)] . . . $200,000,000 . . . shall be made available" for each of fiscal years 2022, 2023, 2024, 2025, and 2026).

59.     Congress has also appropriated additional funds for specific BRIC projects through congressionally directed spending. *See, e.g.,* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 608 (2024) (appropriating approximately $191 million "for pre-disaster mitigation grants under . . . 42 U.S.C. § 5133(e)"); Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4459, 4742 (2022) (similarly appropriating approximately $233 million).

COMPLAINT - 16

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

60.    Salem is not aware of any appropriations legislation ever imposing or authorizing directives for or conditions on BRIC grants related to prohibiting all kinds of DEI, facilitating federal civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant.

### c.    FEMA's FY 2024/2025 BRIC NOFO.

61.    In administering the BRIC grant program for a particular year, FEMA issues a notice of funding opportunity ("NOFO") setting out the amount of funding available for that year, the criteria the agency will apply in selecting projects, and the application instructions. One mandatory criterion is that every project selected must be "cost-effective." 42 U.S.C. § 5133(e)(1)(A).

62.    In 2025, FEMA attempted to unilaterally terminate the BRIC program, without direction from Congress to do so. This termination was enjoined by the district court for the District of Massachusetts, which found that FEMA's failure to run this congressionally authorized grant program was contrary to law. *See State of Washington v. FEMA*, 818 F. Supp. 3d 195, 204–06 (D. Mass. 2025).

63.    Following the court's order, FEMA on March 26, 2026 posted the Fiscal Year 2024 & 2025 Building Resilient Infrastructure and Communities (BRIC) NOFO ("BRIC NOFO") with estimated total program funding of $1 billion. The application period is open for 120 days and the deadline for submissions is July 23, 2026.

64.    The BRIC NOFO states that recipients must "comply with the requirements of Presidential Executive Orders related to grants . . . the full text of which are incorporated by reference" ("BRIC Executive Order Condition").

COMPLAINT - 17

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

65.    The BRIC NOFO also states that "[a] recipient under this funding opportunity must comply with" the FY25 DHS Standard Terms, with certain exceptions. As set forth in paragraphs 85 to 91 below, the incorporated terms include conditions related to prohibiting all kinds of DEI, prohibiting the "promot[ion]" of "gender ideology," or adherence to executive orders unrelated to the purpose of the grant; the excepted terms include conditions related to facilitating federal civil immigration enforcement.

66.    Despite specifically incorporating the FY25 DHS Standard Terms issued on April 18, 2025, the BRIC NOFO appears to contemplate that BRIC awards will incorporate future revisions to the FY25 DHS Standard Terms or, potentially, DHS's "Section 6.5 – Department of Homeland Security (DHS) Standard Terms and Conditions," issued on April 16, 2026 (the "FY26 DHS Standard Terms").[2] In particular, the BRIC NOFO states that recipients "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award," and that "[t]he specific version of the DHS Standard Terms and Conditions applicable to the federal award will be in the federal award package."

67.    The BRIC NOFO also includes a termination provision that supersedes the termination provision of the FY25 DHS Standard Terms. This termination provision (the "BRIC Termination Provision") provides:

> FEMA may terminate the federal award in whole or in part for one of the following reasons identified in 2 C.F.R. § 200.340:
>
> a. If the recipient or subrecipient fails to comply with the terms and conditions of the federal award.
> b. With the consent of the recipient, in which case FEMA and the recipient must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated.

---

[2] DHS, Section 6.5 – Department of Homeland Security (DHS) Standard Terms and Conditions (Apr. 16, 2026), https://www.dhs.gov/sites/default/files/2026-04/26_0421_cfo_fy26-dhs-terms-and-conditions.pdf.

COMPLAINT - 18

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

c. If the federal award no longer effectuates the program goals or agency priorities. Under this provision, FEMA may terminate the award for these purposes if any of the following reasons apply:

   i. If DHS/FEMA, in its sole discretion, determines that a specific award objective is ineffective at achieving program goals as described in this NOFO;
   ii. If DHS/FEMA, in its sole discretion, determines that an objective of the award as described in this NOFO will be ineffective at achieving program goals or agency priorities;
   iii. If DHS/FEMA, in its sole discretion, determines that the design of the grant program is flawed relative to program goals or agency priorities;
   iv. If DHS/FEMA, in its sole discretion, determines that the grant program is not aligned to either the DHS Strategic Plan, the FEMA Strategic Plan, or successor policies or documents;
   v. If DHS/FEMA, in its sole discretion, changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities; or
   vi. For other reasons based on program goals or agency priorities described in the termination notice provided to the recipient pursuant to 2 C.F.R. § 200.341.
   vii. If the awardee falls out of compliance with the Agency's statutory or regulatory authority, award terms and conditions, or other applicable laws.

68.     Applying for a BRIC grant is a significant undertaking. In addition to demonstrating cost-effectiveness, states and their sub-applicants often must undertake months or years of costly planning and design, feasibility studies and modeling, environmental review, and stakeholder engagement to prepare their applications. FEMA then reviews the applications and selects the most promising projects while ensuring that each state that applies is allocated a minimum amount of funding required by the law, and that no one state receives too much funding. *See* 42 U.S.C. § 5133(f)(2). Once projects are selected, recipients and subrecipients often go through additional rounds of planning, permitting, environmental review, and stakeholder engagement before final grant agreements are signed and all the funds are fully obligated.

COMPLAINT - 19

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### d. Salem Plans to Apply for a BRIC Grant.

69.    To ensure its continued access to clean drinking water, Salem intends to apply for a BRIC grant, through OEM, pursuant to the BRIC NOFO. Specifically, Salem will seek federal funding to replace the sole bridge that provides access to the Geren Island Water Treatment Plant.

70.    The Geren Island Water Treatment Plant on the North Santiam River, located in Marion County, provides clean drinking water for the City of Salem and surrounding customers. Located on an island, the only access to the facility is by a steel and wood bridge constructed in 1965. The existing bridge does not meet current strength or seismic standards and will not pass adequate flow in flood conditions.

71.    Salem intends to seek BRIC funding to replace the aged, unsafe bridge with a new structure built to current standards and able to pass at least 100-year flood flows. Due to the presence of endangered and threatened species in the North Santiam River, the project is subject to strict environmental permitting requirements including in-water work restrict to July 1 through August 15 of any given year.

### B. DHS and FEMA Impose New Grant Conditions that Are Unrelated to Disaster Recovery or Preparedness but Advance the Administration's Political Agenda.

#### 1. The Executive Branch Seeks to Impose Its Political Agenda Through Federal Grant Funding.

72.    Since his first day in office, President Trump has issued executive orders that have initiated, and directed federal agencies to participate in, a coordinated effort to impose his political agenda on state and local governments and other federal grant recipients across the country. That effort has included actions to recast American civil rights laws as prohibiting policies that the President and federal agencies have generally and non-specifically described as "promot[ing]" or "advanc[ing]" what his orders have described as "DEI," "diversity, equity, inclusion, and

COMPLAINT - 20

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

accessibility" ("DEIA"), "discriminatory equity ideology," and "gender ideology"—even though many such policies are lawful under existing federal laws and regulations.[3]

73.      President Trump issued an executive order that directs agency heads to include "in every . . . grant award" a term that the recipient "certify that it does not operate any programs promoting DEI" that would violate federal civil rights laws. Exec. Ord. No. 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants; instead, it appears to encompass all the recipient's "programs" (a term that is not defined). *Id*. § 3(b)(iv). The DEI Order does not define the terms "DEI" or "DEIA."

74.      The DEI Order also directs each agency head to include a term requiring the recipient to agree that its compliance "in all respects" with all applicable federal anti-discrimination laws is "material to the government's payment decisions," *id.* § 3(b)(iv)(A), for purposes of the False Claims Act, 31 U.S.C. §§ 3729–3733. The False Claims Act imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For False Claims Act liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element

---

[3] Additional executive orders include: Exec. Ord. No. 14332 § 4(b), 90 Fed. Reg. 38929 (Aug. 7, 2025) ("Grantmaking Order") (requiring federal officials to ensure discretionary grants "demonstrably advance the President's policy priorities" and prohibiting them from awarding discretionary grants that "fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic" or "promote anti-American values"); Exec. Ord. No. 14173 § 1, 90 Fed. Reg. 8633 (Jan. 21, 2025) (criticizing, without substantively defining, DEI and DEIA policies as "undermin[ing] national unity" and embodying "dangerous, demeaning, and immoral race- and sex-based preferences"); Exec. Ord. No. 14151 § 2(b), 90 Fed. Reg. 8339 (Jan. 20, 2025) (directing all federal agency heads to terminate "all . . . 'equity-related' grants or contracts[] and all DEI or DEIA performance requirements for employees, contractors, or grantees," without substantively defining DEI or DEIA); Exec. Ord. No. 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025) (revoking President Biden executive orders relating to, among other topics, diversity, equity, gender identity, and sexual orientation).

COMPLAINT - 21

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the False Claims Act is punishable by a civil penalty, plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); *see also* 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the False Claims Act, the certification condition represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede materiality, an essential element of a False Claims Act claim.

75.    The "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Ord. No. 14168 § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

76.    Another executive order, entitled "Ending Radical Indoctrination in K-12 Schooling," directs federal agencies to develop an "Ending Indoctrination Strategy" to eradicate federal support for "the instruction, advancement, or promotion of gender ideology or

COMPLAINT - 22

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

discriminatory equity ideology." Exec. Ord. No. 14190 § 3, 90 Fed. Reg. 8853 (Jan. 29, 2025) (the "Radical Indoctrination Order"). Relevant here, the Radical Indoctrination Order defines the phrase "[d]iscriminatory equity ideology" as follows:

> "Discriminatory equity ideology" means an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:
>
> (i)    Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;
>
> (ii)   An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
>
> (iii)  An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;
>
> (iv)   Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;
>
> (v)    An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;
>
> (vi)   An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;
>
> (vii)  Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or
>
> (viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

*Id.* § 2(b).

77.    Subsequent executive agency memoranda and communications make clear that the Administration's conception of what federal civil rights law requires, including what constitutes a purportedly "illegal" DEI, DEIA, or gender-related program, is inconsistent with the requirements of federal civil rights statutes as interpreted by the courts.

COMPLAINT - 23

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

78. For instance, in a memorandum dated February 5, 2025, then-Attorney General Pamela Bondi informed United States Department of Justice ("DOJ") employees that the DEI Order "mak[es] clear that policies relating to [DEI] and [DEIA] 'violate the text and spirit of our longstanding Federal civil-rights laws.'"[4] The memorandum states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on race or sex"—potentially reaching affinity groups or teaching about racial history. *Id.*

79. Next, in a July 29, 2025 memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" (the "Discrimination Guidance Memo"), former Attorney General Bondi promoted the Administration's skewed view of DEI and DEIA programs by purporting to provide "guidance" concerning various practices that would be viewed as constituting unlawful discrimination.[5] For instance, despite court decisions holding exactly to the contrary, the Discrimination Guidance Memo states that "allow[ing] males, including those self-identifying as 'women,' to access single-sex spaces designed for females . . . undermine[s] the privacy, safety, and equal opportunity of women and girls." *Id.* at 6. The Memo directs federal funding recipients to "affirm sex-based boundaries rooted in biological differences" to "ensure compliance with federal law." *Id.*

---

[4] Att'y Gen., Memorandum for all Dep't Employees, Ending Illegal DEI and DEIA Discrimination and Preferences at 1 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (quoting the DEI Order).

[5] Att'y Gen., Memorandum for all Federal Agencies, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl.

COMPLAINT - 24

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

80.     Thereafter, in a notice that FEMA distributed widely by email on September 3, 2025, FEMA "advise[d] recipients and subrecipients to review and adhere to the Attorney General's" Discrimination Guidance Memo.

81.     President Trump and the current federal Administration have also undertaken several executive actions in a coordinated effort to force state and local governments to assist Immigration and Customs Enforcement ("ICE") in carrying out federal civil immigration enforcement efforts, notwithstanding laws and policies through which these state and local governments have exercised their rights under the Tenth Amendment to dedicate their law enforcement efforts elsewhere.

82.     The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Exec. Ord. No. 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order"). The Immigration Order also directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law." *Id.* § 2(i).

83.     More broadly, President Trump has used executive orders as a forum to direct Administration officials to take steps to embed his political agenda into the federal government's grant agreements across subject-matter areas and around the country. In the first year of his current term, President Trump issued 230 executive orders, many of them purporting to leverage federal grants to achieve political ends, including termination of all DEI and DEIA initiatives, exclusion of transgender people, and aggressive and lawless immigration enforcement. There is no way to

COMPLAINT - 25

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

know whether, how frequently, and when the President will issue additional executive orders, the subject matters of those executive orders, or the extent to which they would purport to direct Executive Branch officials to take actions related to federal grants. Based on the President's practice to date, however, it appears exceedingly likely that he will continue to do so.

### 2. DHS and FEMA Attach New, Unlawful Conditions to Grants.

84.     Consistent with the agenda and directions laid out in the President's executive orders and agency guidance thus far, DHS has revised the standard terms and conditions applicable to DHS disaster relief and grant programs, including those administered by FEMA. These revisions, together with subsequent DHS actions and guidance, attempt to implement the current Administration's efforts to compel recipients (and their subrecipients) to abandon DEI policies despite clear statutory and decisional law that many such programs are lawful and to cease other activities that do not match the Administration's political agenda.

### a. FY25 DHS Standard Terms.

85.     In April 2025, DHS issued the FY25 DHS Standard Terms, setting forth the terms and conditions applicable to all grants awarded during FY 2025. The FY25 DHS Standard Terms "flow down to subrecipients unless a term or condition specifically indicates otherwise." FY25 DHS Standard Terms, *supra* note 1, at 1.

86.     Relevant here, the FY25 DHS Standard Terms contain two sets of conditions that did not exist in any version of the DHS terms and conditions issued before January 20, 2025.

87.     First, the FY25 DHS Standard Terms contain terms referred to herein as the "FY25 Discrimination Condition," comprised of all of Section C.XVII, entitled "Anti-Discrimination," except for Subsections C.XVII(1)(e) and C.XVII(2)(a)(iii). Specifically:

COMPLAINT - 26

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

XVII.    Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).[6]

(1) Definitions. As used in this clause –

    (a) DEI means "diversity, equity, and inclusion."

    (b) DEIA means "diversity, equity, inclusion, and accessibility."

    (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

    (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

    (e) [*immigration-related provision omitted*]

(2) Grant award certification.

    (a) By accepting the grant award, recipients are certifying that:

    (b) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

    (c) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

    (d) [*immigration-related provision omitted*]

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

*Id.* § C.XVII.

88.    Separate from the FY25 Discrimination Condition, DHS's standard terms and conditions have long required recipients of grant funding to comply with specified civil rights and

---

[6] There is no Section 372 in Title 31 of the United States Code. Salem understands DHS to intend this provision to refer to 31 U.S.C. § 3729(b)(4), which defines the term "material" for purposes of the False Claims Act.

COMPLAINT - 27

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

nondiscrimination laws while performing activities under the grant at issue. These provisions are referred to collectively herein as the "FY25 Civil Rights Conditions" and are as follows in the FY25 DHS Standard Terms:

a.      Section C.III, entitled "Age Discrimination Act of 1975," requires recipients to "comply with the requirements of the Age Discrimination Act of 1975, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 et seq.)." *Id.* § C.III (emphasis omitted).

b.      Section C.IV, entitled "Americans with Disabilities Act of 1990," states that "[r]ecipients must comply with the requirements of Titles I, II, and III of the Americans with Disabilities Act, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213)." *Id.* § C.IV (emphasis omitted).

c.      Section C.VII, entitled "Civil Rights Act of 1964 – Title VI," requires recipients to "comply with the requirements of Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d et seq.)," including "DHS implementing regulations for the Act [that] are found at 6 C.F.R. Part 21" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 7." *Id.* § C.VIII (emphasis omitted).

d.      Section C.VIII, entitled "Civil Rights Act of 1968," requires recipients to "comply with Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 et seq.), . . . as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100," including with respect to "new multifamily housing with four or more dwelling units" as described in "24 C.F.R. Part 100, Subpart D." *Id.* § C.VIII (emphasis omitted).

e.      Section C.XIV, entitled "Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX," requires recipients to "comply with the requirements of Title

COMPLAINT - 28

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 et seq.)," including "DHS implementing regulations [that] are codified at 6 C.F.R. Part 17" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 19." *Id.* § C.XIV (emphasis omitted).

f.      Section C.XVI, entitled "Equal Treatment of Faith-Based Organizations," states: "It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries." *Id.* § C.XVI (emphasis omitted). It further states that "[r]ecipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs." *Id.*

g.      Section C.XXIV, entitled "Limited English Proficiency (Civil Rights Act of 1964, Title VI)," states:

> Recipients must comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help-department-supported-organizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

*Id.* § C.XXIV (emphasis omitted).

COMPLAINT - 29

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

h.      Section C.XXXIII, entitled "Rehabilitation Act of 1973," states: "Recipients must comply with the requirements of Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794)." *Id.* § C.XXXIII (emphasis omitted).

89.     Second, the FY25 DHS Standard Terms contain a provision, entitled "Presidential Executive Orders" and referred to herein as the "FY25 Executive Order Condition," which provides: "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *Id*. § C.XXXI (emphasis omitted).

90.     The FY25 DHS Standard Terms also contain provisions referred to herein as the "FY25 Immigration Conditions," including the entirety of Section C.IX, entitled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials," as well as Subsection C.XVII(2)(a)(iii). Specifically:

a.      Grant recipients and subrecipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which "prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § C.IX(1)(a).

b.      Grant recipients and subrecipients

must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes.

*Id*. § C.IX(1)((b).

COMPLAINT - 30

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

c.    Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer." *Id*. § C.IX(1)(c).

d.    Grant recipients and subrecipients must "provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien." *Id*. § C.IX(1)(d).

e.    Grant recipients and subrecipients must "not leak or otherwise publicize the existence of an immigration enforcement operation." *Id*. § C.IX(1)(e).

f.    Grant recipients "must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that [they] will comply with the requirements of this term," meaning all of Section C.IX, and must also "require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award." *Id*. § C.IX(2).

g.    Grant recipients must "agree[] that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of [H]omeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term." *Id*. § C.IX(3).

h.    "By accepting the grant award, recipients are certifying that: . . . They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration,"[7] *id.* § C.XVII(2)(a)(iii), and agree that

---

[7] The FY25 DHS Standard Terms define the term "illegal immigrant" in this clause to "mean[] any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States." *Id.* § C.XVII(1)(e).

COMPLAINT - 31

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

DHS has "the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated" this certification, *id.* § C.XVII(3).

91.     The Grant Agreement for Salem's PA grant and the BRIC NOFO specifically exclude the FY25 Immigration Conditions. *See supra* ¶¶ 49, 65. However, while Defendants have represented that they will not apply the FY25 Immigration Conditions to every grant award, those representations have proven unreliable. On March 25, 2025, then-DHS Secretary Kristi Noem endorsed the recommendation of Cameron Hamilton, the former Senior Official Performing the Duties of FEMA Administrator, to attach the conditions related to cooperation with ICE to all open and future awards under 12 grant programs; not to attach those conditions to awards under several other grant programs, including PA and BRIC; and to reserve the possibility of attaching those conditions to yet more other grant programs. Then-Secretary Noem endorsed the recommendation even though Mr. Hamilton's memorandum had identified no authority to support its categorization. Yet, when DHS adopted the FY25 DHS Standard Terms (including the FY25 Immigration Conditions related to cooperation with ICE) several weeks later, they stated that they would apply to "all new federal awards," without excluding the programs identified in the memorandum. FY25 DHS Standard Terms, *supra* note 1, at 1.

### b.  FY26 DHS Standard Terms.

92.     More recently, DHS issued the FY26 DHS Standard Terms, effective April 16, 2026 and applicable to "[a]ll recipients, including pass-through entities and their subrecipients." FY26 DHS Standard Terms, *supra* note 2, at 2. In a widely disseminated grant alert, DHS directed that all new grant award packages must refer to, and new grant award recipients must use, the FY26 DHS Standard Terms.

COMPLAINT - 32

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

93.     The FY26 DHS Standard Terms contain provisions substantially similar to the FY25 Discrimination Condition and the FY25 Executive Order Condition. *Id.* at 10, 17.

94.     First, the FY26 DHS Standard Terms contain terms referred to herein as the "FY26 Discrimination Condition," comprising all terms and conditions entitled "Federal Anti-Discrimination Laws Material to the Government's Payment Decisions Under the False Claims Act," except as indicated herein. *Id.* at 10. Specifically:

> Recipients must agree that [their] compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4) (Definition of "material").
>
> (1) Definitions. As used in this term –
>
>> (a) DEI means "diversity, equity, and inclusion."
>>
>> (b) DEIA means "diversity, equity, inclusion, and accessibility."
>>
>> (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190.
>>
>> (d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
>>
>> (e) [*immigration-related provision omitted*]
>
> (2) Grant award certification.
>
>> (a) By accepting the grant award, recipients are certifying that:
>>
>>> (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal antidiscrimination laws; and
>>>
>>> (ii) [*immigration-related provision omitted*]
>
> (3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or the Secretary's designee determines that the recipient has violated any provision of subsection (2).
>
> (4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

*Id.* at 10–11.

COMPLAINT - 33

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

95.     Apart from the FY26 Discrimination Condition, the FY26 DHS Standard Terms also include terms substantially similar to the FY25 Civil Rights Conditions, referred to herein as the "FY26 Civil Rights Conditions." *Id.* at 4, 9. The only change in FY26 is to the term entitled "Civil Rights Act of 1964 – Title VI," which now requires as follows:

> Recipients must comply with the Civil Rights Act of 1964, which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS implementing regulations are in 6 C.F.R. Part 21. The Federal Emergency Management Agency's (FEMA) implementing regulations are in 44 C.F.R. Part 7.

*Id.* at 4. The FY25 Civil Rights Conditions and the FY26 Civil Rights Conditions are referred to collectively herein as the "Civil Rights Conditions."

96.     Second, the FY26 DHS Standard Terms contain a provision, entitled "All Executive Orders Related to Grants" and referred to herein as the "FY26 Executive Order Condition," which provides: "Presidential Executive Orders. Recipients must comply with the requirements and actions of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." *Id.* at 17.

97.     The FY26 DHS Standard Terms also contain provisions, entitled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials" and referred to herein as the "FY26 Immigration Conditions," that are substantially similar to the FY25 Immigration Conditions. *Id.* at 5–6. However, the FY26 clause adds the proviso that:

> [DHS] will analyze whether the conditions in this section will be applied to any grant program in a way that is consistent with the specific statutes that apply to each grant program because the purpose of each grant program has a nexus to immigration activities, law enforcement, or national security, including preventing and responding to acts of terrorism and extremism, and DHS may tailor the conditions in this section to a specific grant program. DHS will clarify in the grant

COMPLAINT - 34

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

documents whether and how the terms in this section apply to each gran  it states that will analyze whether the conditions in this section will be applied to any grant program in a way that is consistent with the specific statutes that apply to each grant program because the purpose of each grant program has a nexus to immigration activities, law enforcement, or national security, including preventing and responding to acts of terrorism and extremism, and DHS may tailor the conditions in this section to a specific grant program. DHS will clarify in the grant documents whether and how the terms in this section apply to each grant.

*Id.* at 5.

98.     The FY25 Discrimination Condition and the FY26 Discrimination Condition are collectively referred to herein as the "Discrimination Conditions." The FY25 Executive Order Condition and the FY26 Executive Order Condition are collectively referred to herein as the "Executive Order Conditions." The FY25 Immigration Conditions and the FY26 Immigration Conditions are collectively referred to herein as the "Immigration Conditions." The Discrimination Conditions, the Executive Order Conditions, and Immigration Conditions are collectively referred to herein as the "Challenged DHS Conditions."

99.     The FY26 DHS Standard Terms also include a new provision referred to herein as the "FY26 Termination Provision." That provision, entitled "Termination of a Federal Award," states that "DHS may terminate a federal award, in whole or in part, . . . [f]or convenience, . . . including when the award no longer advances agency priorities or the national interest," subject to certain unspecified "appropriate exceptions" and certain enumerated exceptions that are not applicable here. FY26 DHS Standard Terms, *supra* note 2, at 15–16.

100.     The FY26 Termination Provision and the substantially similar BRIC Termination Provision are referred to herein together as the "Termination for Convenience Provisions."

COMPLAINT - 35

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### C. The Challenged DHS Conditions and the Termination for Convenience Provisions Are Unlawful.

101.    DHS's adoption of an across-the-board policy to impose, and actual imposition of, the Challenged DHS Conditions is ultra vires, arbitrary and capricious, contrary to law and the Constitution, and in excess of even Congress's legislative power to impose conditions on federal funding. The Termination for Convenience Provisions are also unlawful.

### 1. Defendants Lack Authority to Impose the Challenged DHS Conditions.

102.    No statute confers upon any of the Defendants the power to require grant recipients—and by extension, their subrecipients—to agree to any of the Challenged DHS Conditions in order to obtain the federal funds at issue. To the contrary, FEMA's own regulations acknowledge that "[t]he Stafford Act *requires* that we deliver eligible [federal disaster] assistance as quickly and efficiently as possible consistent with Federal laws and regulations." 44 C.F.R. § 206.200 (emphasis added). They also require that personnel carrying out federal major disaster or emergency assistance functions, including among other things "the processing of the applications [for federal financial assistance], and other relief and assistance activities," perform their work in an "*equitable* and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status." *Id*. § 206.11(b) (emphasis added). The Challenged DHS Conditions disregard Congress's carefully designed statutory schemes for each grant program. Nor does Article II of the Constitution grant the Executive Branch any power of its own to impose spending conditions unilaterally, because that is a legislative power reserved to Congress under Article I.

103.    In short, Defendants have no authority whatsoever to adopt the Challenged DHS Conditions. Yet that is precisely what they have done.

COMPLAINT - 36

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### 2. The DHS Conditions Are Ambiguous.

104. The Challenged DHS Conditions are vague and ambiguous on multiple grounds. First, the Discrimination Conditions fail to make clear what conduct is prohibited and fail to specify clear standards for enforcement by the DHS Secretary or the Secretary's designee.

105. The Discrimination Conditions are also vague and ambiguous because they do not define the terms "DEI" and "DEIA" (other than by listing the words that each letter in each acronym represents); the term "operate" with respect to "programs"; or the terms "advance" and "promote" with respect to DEI, DEIA, and discriminatory equity ideology. FY25 DHS Standard Terms, *supra* note 1, § C.XVII; FY26 DHS Standard Terms, *supra* note 2, at 10–11.

106. The terms DEI and DEIA are expansive and could be understood to include conduct and speech that are lawful under the First Amendment and settled and longstanding understandings of civil rights law.

107. As written, the Discrimination Conditions are unclear, and it is not fair or lawful to require Salem to certify to a vague condition. The vagueness and ambiguity of the Discrimination Conditions leaves Salem vulnerable to different interpretations from the Administration. This is perilous because the Administration appears intent on enforcing its views of DEI on grant recipients through False Claims Act enforcement and funding suspensions and terminations.

108. That the Discrimination Conditions purport to prohibit "programs that advance or promote DEI, DEIA, or discriminatory equity ideology *in violation of Federal anti-discrimination laws*," FY25 DHS Standard Terms, *supra* note 1, § C.XVII(2)(a)(i) (emphasis added); *see also* FY26 DHS Standard Terms, *supra* note 2, at 10, only adds to this ambiguity. For example, it is possible to read the Discrimination Conditions as stating, contrary to prevailing law, that all such programs violate federal civil rights laws—particularly in light of the Administration's actions,

COMPLAINT - 37

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

including the DEI Order and former Attorney General Bondi's Discrimination Guidance Memo described above. *See supra* ¶ 79. But the Supreme Court has made clear that not all discussions of how race affects a person's life, "be it through discrimination, inspiration, or otherwise," are unlawful. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).

109.    Indeed, the Discrimination Conditions provide that DHS "reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient" operates impermissible DEI programs—seemingly regardless of whether the Secretary's views comport with authoritative judicial pronouncements. FY25 DHS Standard Terms, *supra* note 1, § C.XVII(3); FY26 DHS Standard Terms, *supra* note 2, at 11.

110.    The presence of the separate Civil Rights Conditions further suggests that the Discrimination Conditions could be read to prohibit all programs that "advance or promote DEI, DEIA, or discriminatory equity ideology." FY25 DHS Standard Terms, *supra* note 1, § C.XVII(2)(a)(i); FY26 DHS Standard Terms, *supra* note 2, at 10. There should be no need to include the Discrimination Conditions if programs that "advance or promote DEI, DEIA, or discriminatory equity ideology" also violate the Civil Rights Conditions. *Id.*

111.    Similarly, the Executive Order Conditions seemingly demand that recipients "comply" with an executive order asserting the authoritativeness of the President's and the Attorney General's pronouncements on questions of law. FY25 DHS Standard Terms, *supra* note 1, § C.XXXI; FY26 DHS Standard Terms, *supra* note 2, at 17. *See* Exec. Ord. No. 14215 § 7, 90 Fed. Reg. 10447 (Feb. 18, 2025). That executive order, in turn, could be read to include former

COMPLAINT - 38

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Attorney General Bondi's Discrimination Guidance Memo, even though that memo is in some important ways at odds with judicial interpretation. *Supra* ¶ 79, note 5.

112.    The Executive Branch's insistence on unlawfully re-interpreting civil rights law makes it challenging for recipients to understand the conditions with which they are agreeing to comply. As a result, seemingly benign requirements, such as complying with Title VI of the Civil Rights Act of 1964, are treacherous: Salem cannot take comfort in agreeing to abide by well-settled federal law. *See* FY25 DHS Standard Terms, *supra* note 1, § C.VIII; FY26 DHS Standard Terms, *supra* note 2, at 4. Instead, Defendants may seek to require Salem to adhere to the President and Attorney General's *interpretations* of Title VI, which are both untethered to judicial interpretations and lacking in authority. This is true for all of the Civil Rights Conditions.

113.    To remedy that particular harm, any relief related to the Challenged DHS Conditions must also clarify that the references to statutes in the Civil Rights Conditions mean those statutes as enacted by Congress and interpreted by the judiciary, such that it would not be a breach of those conditions for a recipient to take actions that comply with the law as interpreted by the courts, even if those actions run counter to the Executive's view of those laws.

114.    Second, the Executive Order Conditions are vague and ambiguous because they fail to define or provide meaningful contours on the scope of the term "related to grants." FY25 DHS Standard Terms, *supra* note 1, § C.XXXI; FY26 DHS Standard Terms, *supra* note 2, at 17.

115.    The Executive Order Conditions are also vague and ambiguous because executive orders do not apply by their terms to federal grant recipients. Even if executive orders could be said to directly regulate recipient behavior, the Executive Order Conditions compound ambiguities atop ambiguities because the executive orders themselves are replete with broad and ambiguous

COMPLAINT - 39

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

terms and instructions—such as what it means "to promote gender ideology,"[8] to "demonstrably advance the President's policy priorities" or to "promote," "encourage," or "facilitate" "racial preferences," "denial . . . of the sex binary . . . or the notion that sex is a chosen or mutable characteristic," or "initiatives that compromise public safety or promote anti-American values";[9] to "instill a patriotic admiration for our incredible Nation and the values for which we stand" or to engage in "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology";[10] to advocate or advance "immoral race- and sex-based preferences";[11] and to conduct activities that are "equity-related" or contain "DEI or DEIA performance requirements."[12]

116.    The scope and meaning of the Executive Order Conditions are also incapable of being ascertained to the extent they purport to obtain recipients' acquiescence in advance to conditions that may come into existence in the future, if and to the extent the President subsequently issues or amends executive orders related to grants.[13]

117.    It is exceedingly likely that additional grant-related executive orders will issue. President Trump signed well over twice as many executive orders in the first eight months of the current presidential term than any President in the last seventy years has issued in any one full calendar year.

---

[8] Gender Ideology Order, *supra* ¶ 75, § 3(g).
[9] Grantmaking Order, *supra* note 3, § 4(b)(i)–(ii).
[10] Radical Indoctrination Order, *supra* ¶ 76, §§ 1, 3(b)(i)–(ii).
[11] DEI Order, *supra* ¶ 73, § 1.
[12] Exec. Ord. No. 14151 § 2(b)(i), 90 Fed. Reg. 8339 (Jan. 20, 2025).
[13] Those future conditions would also violate the spending power for the additional, independent reason that they would be a surprise and would be imposed post-acceptance.

COMPLAINT - 40

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### 3.    The DHS Conditions Are Based on Incorrect Views of the Law.

118.    As noted above with respect to the Discrimination Conditions and Executive Order Conditions, the Executive Branch attempts to rewrite federal civil rights law rather than apply the law as it has long been understood and interpreted by the courts.

119.    For example, former Attorney General Bondi's Discrimination Guidance Memo states that organizations must "affirm sex-based boundaries rooted in biological differences," even though the Administration's insistence on "the sex binary" and its refusal to recognize the reality of gender identity, *supra* ¶ 79, is inconsistent with governing law, *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 662, 669 (2020) ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms . . . . [D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex.").

120.    Moreover, neither the text of Title VI nor any other federal civil rights statute supports the Administration's insistence that it is unlawful to accord any concern and attention to diversity, equity, or inclusion, let alone that the federal government can bar recipients of federal funding from doing so.

121.    The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.

122.    Indeed, existing case law firmly rejects the Executive Branch's unmoored assertions regarding civil rights law with respect to DEI and DEIA, and instead holds that neither the Constitution nor federal civil rights laws prohibit affinity groups and DEI/DEIA trainings and initiatives, whether by governmental or nongovernmental entities. *See, e.g.*, *Diemert v. City of*

COMPLAINT - 41

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Seattle*, 776 F. Supp. 3d 922, 939–40 (W.D. Wash. 2025) (although "D.E.I. initiatives" and conversations about race, sex, and other matters "may prompt discomfort or spark debate, they do not necessarily violate anti-discrimination laws. Multiple courts in recent years have reached the same conclusion . . . . Quite the opposite, many courts have held that anti-discrimination trainings play a vital role in preventing workplace discrimination . . . . D.E.I. and anti-discrimination trainings are not per se unlawful.") (collecting cases), *appeal filed*, No. 25-1188 (9th Cir. Feb. 25, 2025).

123.    The Discrimination Conditions also squarely conflict with Title VI of the Civil Rights Act of 1964. Section (3) of the FY25 Discrimination Condition provides that "DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of [the Conditions]." FY25 DHS Standard Terms, § C.XVII(3). The FY26 Discrimination Condition is materially similar. FY26 DHS Standard Terms at 11. Title VI, however, sets out strict procedural requirements for agencies that decide to terminate grant funding:

> [N]o such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. § 2000d-1. The Discrimination Conditions fail to provide recipients with notice and the ability to cure potential issues, despite Title VI mandating all agencies to provide such due process.

COMPLAINT - 42

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

124.    The Executive Order Conditions are similarly misguided because executive orders express general policy and are addressed to the Executive Branch; they do not by their terms apply to, or impose any requirements on, federal grant recipients.

125.    Nonetheless, several executive orders that could be described as "related to grants," FY25 DHS Standard Terms, *supra* note 1, § C.XXXI; FY26 DHS Standard Terms, *supra* note 2, at 17, have broad and ambiguous language that could be read to impose conditions materially similar to the Discrimination Conditions. Those include the executive orders cited in paragraphs 73–76 above.

126.    One executive order could be read as requiring recipients to agree not to "promote gender ideology." *See* Gender Ideology Order, *supra* ¶ 75, § 3(g). Another could be read as purporting to force recipients to accede to the legal interpretations of President Trump and the Attorney General, even when those interpretations contravene settled law. *See* Exec. Ord. No. 14215 § 7, 90 Fed. Reg. 10447 (Feb. 18, 2025) ("The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the Executive Branch. The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties.").

### 4. The Challenged DHS Conditions May Require Grant Recipients to Violate the Constitution.

127.    The Challenged DHS Conditions could require recipients to unconstitutionally police speech and First Amendment activity of affiliated third parties (including contractors, subcontractors, and subrecipients). This is not an unsupported concern. In late September 2025, FEMA widely distributed an email announcement bulletin that federal funding recipients will be

COMPLAINT - 43

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

prohibited from "empower[ing] radical organizations with unseemly ties that don't serve the interest of the American people," no phrase of which is further defined.[14]

128.    The same week, the President issued a National Security Presidential Memorandum directing then-DHS Secretary Kristi Noem and other federal officials to develop a "comprehensive strategy" to "disband and uproot networks, entities, and organizations" that are identified by "indicia" including "extremism on migration, race, and gender" and "hostility towards those who hold traditional American views on family, religion, and morality."[15] None of those phrases is defined or clarified. *Id.*

129.    These communications show the Administration's attempts to stifle recipients' speech. They likewise show the Administration's goal of requiring recipients to police the speech of affiliated third parties.

### 5.    The New Termination Provisions Are Unlawful.

130.    DHS and FEMA exceeded their lawful authority in issuing and requiring recipients, including Salem, to agree to the Termination for Convenience Provisions. The Termination for Convenience Provisions seek to permit termination at DHS and FEMA's discretion for new and unspecified reasons after Salem accepts grant funding and begins implementing projects in reliance on that funding.

131.    The FY26 DHS Standard Terms cite the Grantmaking Order (Executive Order 14332) and 2 C.F.R. § 200.340, an Office of Management and Budget ("OMB") regulation, as

---

[14] FEMA, Bulletin for Week of September 23, 2025 (Sept. 23, 2025), https://content.govdelivery.com/accounts/USDHSFEMA/bulletins/3f4027a.
[15] National Security Presidential Memorandum, Countering Domestic Terrorism and Organized Political Violence, § 1, 90 Fed. Reg. 47225 (Sept. 25, 2025).

COMPLAINT - 44

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

sources of authority. FY26 DHS Standard Terms, *supra* note 2, at 15–16. Neither source, however, provides a legal basis to impose the Termination for Convenience Provisions.

132.    The federal government's authority to terminate grants differs significantly from its authority to terminate federal contracts, where termination for convenience provisions are common and authorized by regulation. *See, e.g.*, 48 C.F.R. §§ 52.249-1–.249-12. For federal grants, OMB has promulgated its Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, commonly known as the Uniform Guidance and codified at Title 2 of the C.F.R. The Uniform Guidance states that it "is guidance, not regulation." 2 C.F.R. § 1.105(b). But it also requires that "Federal agencies making Federal awards to non-Federal entities . . . implement" substantive portions of the Uniform Guidance "in codified regulations unless different provisions are required by Federal statute or are approved by OMB." 2 C.F.R. § 200.106 (requiring that awardees implement "the language in subparts C through F" of the Uniform Guidance, which includes award requirements, cost principles, and audit requirements); *see also* 2 C.F.R. § 200.107 (explaining that "OMB will review Federal agency regulations and implementation" of the Guidance, and that "[a]ny exceptions will be subject to approval by OMB and only with adequate justification from the Federal agency").

133.    DHS has adopted and thus given regulatory effect to 2 C.F.R. Part 200, including 2 C.F.R. § 200.340, entitled "Termination." *See* 2 C.F.R. § 3002.10. DHS adopted the OMB guidance in 2014.

134.    OMB's "Termination" provisions appear in a subpart of 2 C.F.R. Part 200 entitled "Remedies for Noncompliance," and list a limited number of reasons for which an agency can terminate an existing federal award. *See* 2 C.F.R. §§ 200.339–.343. From December 2013 to 2020, the Uniform Guidance's Remedies for Noncompliance permitted termination of a federal grant

COMPLAINT - 45

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

award only (1) if the recipient failed to comply with the terms and conditions of the award; (2) for cause; or (3) with the consent of the recipient. 2 C.F.R. § 200.339(a)(1)–(3) (2013); *see also* 2 C.F.R. § 200.339(a)(1)–(3) (2015). Termination of the grant award was also permitted when initiated by the recipient upon written notice to the awarding agency. *Id*. § 200.339(a)(4). The 2013 and 2015 versions of OMB's "Termination" provisions did not permit termination of federal awards for "convenience," nor when "the award no longer advances agency priorities or the national interest." *See* 2 C.F.R. § 200.339 (2013); 2 C.F.R. § 200.339 (2015).

135.    OMB revised the Uniform Guidance in 2020 and 2024. *See* 2 C.F.R. § 200.340 (2020); 2 C.F.R. § 200.340. The current version of OMB's "Termination" provisions, last updated in 2024, provides four enumerated bases by which a federal award "may be terminated in part or its entirety." 2 C.F.R. § 200.340(a)(1)–(4). None of these provisions allows termination "for convenience" or "when the award no longer advances . . . the national interest." *See* 2 C.F.R. § 200.340. One of the four enumerated bases, codified at 2 C.F.R. § 200.340(a)(4), provides that federal agencies may terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals *or agency priorities*." 2 C.F.R. § 200.340(a)(4) (emphasis added).

136.    OMB first amended the termination provisions in 2020 to permit an agency, "to the greatest extent authorized by law," to terminate an award if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). At that time, OMB made clear that this new termination provision granted federal agencies only limited new authority to terminate grants. Responding to concerns "that the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause," OMB emphasized that "as written agencies are not able to terminate grants arbitrarily." OMB, Guidance for Grants and

COMPLAINT - 46

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Agreements, 85 Fed. Reg. 49506, 49509 (Aug. 13, 2020). Rather, OMB clarified that "[t]he intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." *Id*. at 49507. OMB explained that the new termination provision permitted federal agencies to terminate grants where, for instance, "additional evidence reveals that a specific award objective is ineffective at achieving program goals," or where "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id*. at 49507–08. At the same time, OMB clarified in its final guidance that agencies "are not able to terminate grants arbitrarily." *Id*. at 49509.

137.    OMB revised the termination provisions in 2024 to clarify that an award could be terminated "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024). OMB explained that this revision continued to permit termination of an award "pursuant to the terms and conditions of the Federal award," and that "this may include a term and condition allowing termination . . . , to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." OMB, Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). OMB concluded that "the final version of the guidance provides greater clarity on the policy for termination of awards by the Federal agency or pass-through entity by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id*. OMB never suggested, in either the 2020 or 2024 rulemaking, that a grant could be terminated even though the grant was continuing to serve the very goals for which the monies had initially been awarded, merely because the agency's priorities shifted midway during the use of the grant—let alone with no advance notice.

COMPLAINT - 47

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

138.    Nowhere do OMB's current Uniform Guidance, or the version of the Uniform Guidance in place at the time of DHS's adoption, permit "termination for convenience." *See generally* 2 C.F.R. Part 200. Nowhere do OMB's current Uniform Guidance, or the version of the Uniform Guidance in place at the time of DHS's adoption, permit termination where the award no longer advances the "national interest." *See generally* 2 C.F.R. Part 200.

139.    Since the second Trump Administration began, federal agencies have used 2 C.F.R. § 200.340(a)(4) to terminate thousands of grant awards when the agency simply changes its mind. This new and unsupported interpretation of 2 C.F.R. § 200.340(a)(4) is the subject of litigation in *New Jersey v. U.S. Office of Mgmt. and Budget*, No. 1:25-CV-11816-IT (D. Mass.). Numerous other plaintiffs have challenged specific terminations by this administration purportedly on the basis of changed agency priorities.

140.    2 C.F.R. § 200.340(a)(4) authorizes the termination of an award only where the "award no longer effectuates the program goals or agency priorities," not where an agency changes its priorities after an award is made. The rulemaking history of 2 C.F.R. § 200.340(a)(4), discussed above, shows that OMB intended to permit terminations in only limited circumstances, and provides no support for a broad power to terminate grants on a whim based on agency priorities identified only after awards have been made. Further, the text of 2 C.F.R. § 200.340(a)(4) makes no reference to terminations based on changes in agency preferences that occur after a grant is awarded.[16] Yet, this administration has used 2 C.F.R. § 200.340(a)(4) to reduce or terminate awarded grants based on newly identified agency priorities, even where those priorities conflict

---

[16] Additionally, if an agency could terminate any award simply because it has changed its mind, that would render wholly superfluous the many other carefully crafted regulatory provisions that address agency termination authority. *See, e.g.*, 2 C.F.R. §§ 200.340(a)(1)–(3), 200.340(b).

COMPLAINT - 48

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

with the priorities of Congress in authorizing the program or the priorities of the agency at the time of the grant award.

141.    The FY26 Termination Provision cites 2 C.F.R. § 200.340(a)(4) as its regulatory basis, but goes well beyond the OMB clause, even as broadly and unlawfully used by this Administration. FY26 DHS Standard Terms, *supra* note 2, at 15–16. First, the FY26 Termination Provision, on its face, is not limited to a change in program goals or agency priorities as a basis for termination, and instead extends to any purported basis that the agency may unilaterally assert is a "convenience." *Id.* Second, the FY26 Termination Provision expressly permits termination if the award no longer furthers "the national interest," an utterly vague and undefined term. *Id. See also* 2 C.F.R. § 200.340(b) (agencies must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award"). Third, the FY26 Termination Provision, unlike 2 C.F.R. § 200.340(a)(4), is not limited to terminations "authorized by law." *See* FY26 DHS Standard Terms, *supra* note 2, at 15–16.

142.    Additionally, the Grantmaking Order—also cited in the FY26 DHS Standard Terms—does not and cannot provide any separate legal basis for the FY26 Termination Provision. *See* Grantmaking Order, *supra* note 3. First, the Grantmaking Order on its own does not provide legal authority for federal agencies to impose new grant conditions on grant recipients. *City of Chicago v. Noem*, No. 25 CV 12765, 2025 WL 3251222, at *9 n.13 (N.D. Ill. Nov. 21, 2025) ("Similarly, the statutes funding the grants and programs in this case do not allow Executive Orders to control the distribution of funds."); *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1026–28 (N.D. Cal. 2025), *appeal filed*, No. 26-402 (9th Cir. Jan. 20, 2026) (explaining Congress did not confer authority on DHS or FEMA to impose grant conditions that, among other things, forced compliance with all executive orders). Second, the Grantmaking Order requires federal agencies

COMPLAINT - 49

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

to insert termination for convenience clauses into their grant agreements for new and existing awards "to the maximum extent permitted by law." Grantmaking Order, *supra* note 3, § 6(b). The Grantmaking Order states that it applies only to discretionary grant funds, not "programs where legislation establishes an entitlement to the funds on the part of the recipient, such as block grants; those awarded based on a statutory formula; or disaster recovery grants." *Id.* § 2(d). By contrast, the FY26 Termination Provision contains no limitation to the "extent permitted by law," nor is it limited to discretionary grants. FY26 DHS Standard Terms, *supra* note 2, at 15–16. Moreover, the Grantmaking Order cites no statutory or regulatory authority for this new power it requires agencies to wield to terminate grants unilaterally for "convenience," including for new and unannounced changes in agency priorities, other than 2 C.F.R. § 200.340(a)(4). Grantmaking Order, *supra* note 3. And as discussed above, 2 C.F.R. § 200.340(a)(4) itself is intended to be narrow, does not permit terminations for post-award changes in agency priorities, and certainly does not support the broad termination power that Defendants now invoke. *See* 2 C.F.R. § 200.340(b). And importantly, the versions of the OMB termination regulation adopted by DHS in 2013 and 2015 do not contain any provision allowing for termination based on agency priorities. *See* 2 C.F.R. § 200.339 (2013); 2 C.F.R. § 200.339 (2015).

143.    Defendants do not have the power to terminate grants for "convenience," including for post hoc changes in agency priorities, where Congress has directed funds to be spent on particular grant programs. Defendants also do not have the power to substitute their own "agency priorities" for the program objective identified by Congress.

144.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "Congress's power to spend is directly linked to its power to legislate. Incident to the spending power, Congress may

COMPLAINT - 50

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

attach conditions on the receipt of federal funds." *Id.* at 1231–32 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)) (alteration omitted).

145.    The executive power vested in the President does not include the power to attach conditions on the receipt of federal funds. To the contrary, there is "no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* at 1232 (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

146.    The Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *Id.* at 1234. *See also Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("The authority to pass laws and the power of the purse rest in the legislative not the executive branch."); *id.* at 887 (executive agencies "cannot pursue the policy objectives of the executive branch through the power of purse"). None of the authorizing statutes at issue allow Defendants to unilaterally terminate grants for "convenience." Where Congress has appropriated funds and directed that they be spent on a particular objective, the agency cannot simply substitute its own policy objectives or other reasons, defined as "convenience," to terminate already-awarded grants without violating separation of powers. *See Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413 (LJL), 2026 WL 588117, at *56 (S.D.N.Y. Mar. 3, 2026), *appeal filed*, No. 26-1213 (2d Cir. Mar. 4, 2026) (agency did not have authority to terminate grant for pilot program at will where the authorizing statute did not provide such authority).

147.    The FY26 Termination Provision violates the separation of powers by effectively creating a backdoor to unlawful impoundment. Where Congress has appropriated funds and directed that they be spent on particular grant programs, terminating those grants for agency convenience without re-obligating those funds has the effect of unlawfully impounding and refusing to spend Congressionally appropriated funds. *See In re Aiken County*, 725 F.3d 255, 261

COMPLAINT - 51

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (explaining that the Executive Branch "does not have unilateral authority to refuse to spend [congressionally appropriated] funds").

148. The FY26 Termination Provision also violates Spending Clause principles. The Spending Clause requires Congress to provide grant recipients fair notice of the conditions that apply to the disbursement of funds they receive. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). The funding conditions must be set out "unambiguously" in the relevant statute. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). The FY26 Termination Provision violates these Spending Clause mandates because it does not provide notice of or, on its face, set any limits on the reasons for which Defendants may terminate any of Salem's grants.

149. For similar reasons, the BRIC Termination Provision well-exceeds the authority codified in 2 C.F.R. § 200.340(a)(4). While the BRIC Termination Provision at least purports to enumerate the reasons for which FEMA may terminate where "the federal award no longer effectuates the program goals or agency priorities," those reasons include where FEMA "changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities," and other reasons that similarly permit terminations based on newly identified or changed priorities. *See* BRIC Termination Provision, *supra* ¶ 67. Salem could fully align its proposed project with The BRIC NOFO in applying for and receiving a BRIC award, and have the agency change its mind the next day and terminate its award for any unspecified change in the program's goals and priorities, in FEMA's "sole discretion." *Id.*

COMPLAINT - 52

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

150.    Salem plans to apply for a BRIC award through the BRIC NOFO. Salem may also apply for, receive, and accept other new DHS/FEMA grants that incorporate the FY26 DHS Standard Terms, which "apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2026." FY26 DHS Standard Terms, *supra* note 2, at 2. And given the Grantmaking Order's broad directive to federal agencies, Salem is legitimately concerned that Defendants will attempt to insert the FY26 Termination Provision (or a materially similar provision) into the agreement for its PA grant that OEM already awarded.

151.    To the extent the Termination for Convenience Provisions would allow termination of grants due to recipients' DEI policies, they also conflict with Title VI for the same reasons discussed *supra*, ¶ 123. Specifically, Title VI sets out strict procedural requirements for agencies that decide to terminate grant funding because of alleged discrimination. 42 U.S.C. § 2000d-1. The Termination for Convenience Provisions would allow agencies to bypass those procedural requirements in violation of Title VI.

152.    Salem has a strong interest in obtaining clarity regarding its rights and obligations for grants to be awarded imminently and future grants that it anticipates applying for. Salem relies on DHS/FEMA funding for disaster recovery and management. Salem therefore has powerful reliance interests in the continuation of this funding, and in knowing the law governing the grants they would otherwise be accepting. Salem should not have to guess at whether Defendants can cut off its federal funding on a whim and for reasons not known to it at the time of the grant, thus suddenly and unlawfully upending carefully planned budgets and programs that account for these grants.

153.    The Termination for Convenience Provisions also provide Defendants with an opportunity to end-run any preliminary injunction issued in this case, allowing them to terminate

COMPLAINT - 53

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

a covered grant "for convenience" or for a newly claimed agency priority, when in reality the termination is due to participation in this lawsuit or for having a lawful DEI/DEIA program. *See* FY26 DHS Standard Terms, *supra* note 2, at 16; BRIC Termination Provision, *supra* ¶ 67. Indeed, the Grantmaking Order justifies the requirement for agencies to add termination for convenience provisions because federal grant funding purportedly went to "diversity, equity, and inclusion and other far-left initiatives" that "propagat[e] absurd ideologies." Grantmaking Order, *supra* note 3, § 1.

154. The threat of unlawful, retaliatory, and/or arbitrary termination is real, concrete, credible, and not speculative. Defendants and other federal agencies have reallocated, reduced, or terminated billions of dollars of grants to state and local governments for reasons deemed unlawful or likely unlawful by courts. *See, e.g.*, *Illinois v. Noem*, 813 F. Supp. 3d 282, 304 (D.R.I. 2025) (reallocation of hundreds of millions of dollars of HSGP grant funds away from states with sanctuary policies violated the APA), *appeal filed*, No. 26-1182 (1st Cir. Feb. 24, 2026); *Chicago v. DHS*, 815 F. Supp. 3d 727, 761 (N.D. Ill. 2025) (DHS's decision to withhold and eliminate Shelter and Services program funding to Chicago, Denver, and others based on purported noncompliance with changed agency priorities likely arbitrary and capricious under the APA); *Illinois v. Vought*, No. 26-CV-1566, 2026 WL 962287, at *4 (N.D. Ill. Mar. 12, 2026) (preliminarily enjoining decision to target four states for HHS grant terminations or suspensions, for reasons unrelated to the Congressional authorization for public-health grants as likely arbitrary and capricious and contrary to law under the APA); *Washington v. U.S. Dep't of Com.*, 812 F. Supp. 3d 1169, 1184 (W.D. Wash. 2025) (termination of NOAA cooperative agreements for changed agency priorities likely arbitrary and capricious and violation of Spending Clause); *Washington v. FEMA*, 818 F. Supp. 3d 195, 204–06 (D. Mass. 2025) (permanently enjoining

COMPLAINT - 54

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

termination of the BRIC program). Based on this recent history and practice, if subject to the new Termination for Convenience Provisions, Salem cannot be certain that it will be able to rely on DHS and FEMA grant awards for the duration of the grant.

**D.  Salem Must Agree Either Agree to Unlawful Conditions or Forgo Funding Critical to Protecting People and Property.**

155.    Defendants now insist that recipients and subrecipients like Salem are not entitled to critical disaster relief and management funds unless they acquiesce to the Administration's domestic political agenda. There is no legal basis for DHS's adoption of the Challenged DHS Conditions, nor is there any lawful basis for Defendants to attach those conditions to Salem's grants.

156.    Nonetheless, the sweeping imposition of the Challenged DHS Conditions on the receipt of federal funds now imperils more than a million dollars in already awarded disaster recovery funding and potentially more if Salem is awarded a BRIC grant or other DHS or FEMA funding in the future.

157.    Congress intended and directed that the funds be spent to fund disaster preparedness, mitigation, and recovery for state and local governments.

158.    The grant conditions that Defendants seek to impose leave Salem with the Hobson's choice of accepting illegal conditions that are without authority, contrary to the Constitution, and accompanied by heightened risk of False Claims Act claims, or forgoing the benefit of substantial grant funds that pay for disaster recovery and mitigation projects essential to keeping Salem and its neighboring communities' residents safe.

159.    The uncertainty caused by these illegal conditions has impeded Salem's ability to budget and plan for its financial future in both the near- and long-term. After the federal disaster declaration was issued in April 2026, expressly contemplating funds for the culvert replacement

COMPLAINT - 55

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

project, Salem anticipated receiving PA funding from DHS and FEMA. Now, because of the unlawful grant conditions, Salem may need to pay for the project from local sources, impacting Salem's other spending priorities. And, like any municipality, Salem must prepare for *future* natural disasters and emergencies, which could arise at any time. After DHS and FEMA's new imposition of unlawful conditions on critical disaster relief funding, Salem must anticipate that the same conditions will be attached to other emergency relief funds in the future, should they be needed. This could mean diverting funds from other community-critical programs to build reserves in case Salem is forced to respond to potential future disasters without federal funding at all.

160.    Salem is especially at risk of harm because Defendants have intentionally crafted the conditions to expose recipients to liability under the False Claims Act based on actions that are lawful under the judiciary's authoritative interpretation of federal civil rights law. It is invariably harmful for any entity to face unwarranted threats of criminal investigation or prosecution or lawsuits that could have such significant economic consequences. That is all the more true here, where the threat is tangible, concrete, and imminent, and where the federal Administration itself is proactively moving to substantially increase the risks and stakes.

161.    DOJ has formed a nationwide task force specifically to target grant recipients that sign these certifications, has described potential liability under the False Claims Act as a "weapon" it will deploy, and has "strongly encourage[d]" private parties to bring civil suits.[17]

162.    Calling the False Claims Act DOJ's "primary weapon" in this fight, then-Deputy Attorney General Todd Blanche announced on May 19, 2025 that DOJ would set up a "Civil Rights Fraud Initiative" that will "utilize the False Claims Act to investigate and, as appropriate, pursue

---

[17] Deputy Att'y Gen'l, Memorandum, Civil Rights Fraud Initiative at 1–2 (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl.

COMPLAINT - 56

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

claims against any recipient of federal funds that knowingly violates civil rights laws"—or, more accurately, the Administration's reimagining thereof. *Id.* at 1–2. The announcement asserts that the False Claims Act "is implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through [DEI] programs that assign benefits or burdens on race, ethnicity, or national origin." *Id.* at 1. It further states that "[t]he Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients." *Id.* at 2. DOJ also "strongly encourages" private lawsuits under the False Claims Act. *Id.*

163.    DOJ reaffirmed this threat on June 11, 2025, when Assistant Attorney General Brett Shumate announced his intent to dedicate "all available resources" of the DOJ Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices" and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws."[18]

164.    The FY25 Discrimination Condition, *supra* ¶ 87, expressly cites the False Claims Act, stating that recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372[9](b)(4)"—that is, for purposes of the False Claims Act. The FY26 Discrimination Condition, *supra* ¶ 94, similarly requires recipients to agree that their "compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of" the False Claims Act.

---

[18] Asst. Att'y Gen'l, Memorandum to all Civil Div. Employees, Civil Division Enforcement Priorities at 1 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl.

COMPLAINT - 57

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

165.    The Discrimination Conditions also state that if DHS concludes that a grant recipient violated a grant condition, "all amounts" previously received by recipient "will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law." *Id.*

166.    The Administration has already initiated investigations into local governments for allegedly unlawful DEI practices:

a. In May 2025, DOJ's Civil Rights Division sent a letter to Chicago Mayor Brandon Johnson announcing that the Department of Justice "is opening an investigation to determine whether the City of Chicago, Illinois, is engaged in a pattern or practice of discrimination based on race, in violation of Title VII." The letter explained that the investigation "is based on" Mayor Johnson's alleged remarks highlighting the number of Black officials in the Mayor's administration.[19]

b. In October 2025, White House OMB Director Russ Vought announced that "$18 billion in New York City infrastructure projects have been put on hold to ensure funding is not flowing based on unconstitutional DEI principles."[20]

c. The U.S. Department of Transportation has likewise withheld more than $2 billion in funding from the Chicago Transit Authority while the Administration investigates whether the Authority has violated anti-discrimination laws, citing

---

[19] Letter from Harmeet K. Dhillon to The Honorable Brandon Johnson (May 19, 2025), https://www.justice.gov/crt/media/1400811/dl?inline.

[20] Russ Vought (@russvought), Twitter (Oct. 1, 2025, 8:54 a.m.), https://x.com/russvought/status/1973386129320665329.

COMPLAINT - 58

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

allegations that the Authority "has regularly touted its DBE [Disadvantaged Business Enterprise] goals as a key part of its equity mission."[21]

## V.     CAUSES OF ACTION

### Count 1: Separation of Powers

*Challenged DHS Conditions and Termination for Convenience Provisions;*

*Against All Defendants*

167.     Salem re-alleges and incorporates the above as if set forth fully herein.

168.     The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F.*, 897 F.3d at 1231. This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (second alteration in original) (quoting *Clinton*, 524 U.S. at 438).

169.     The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. I, § 1, the spending power, *see id.* § 8, cl. 1, and the appropriations power, *see id.* § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

170.     "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC*

---

[21] Press Release, U.S. Dep't of Transp., U.S. Department of Transportation Statement on Review of Chicago's Discriminatory, Unconstitutional Processes (Oct. 3, 2025), www.transportation.gov/briefingroom/us-department-transportation-statement-review-chicagos-discriminatory.

COMPLAINT - 59

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

171.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v.  Env't Prot. Agency*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

172.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227. Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

173.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq*. The President has not done so.

174.    In leveraging its spending power under the Constitution, Congress has not conditioned the provision of funding for DHS grant programs on compliance with a prohibition on all forms of DEI or DEIA policies and initiatives, refusal to recognize transgender people, or any of the other terms, provisions, or principles that the Challenged DHS Conditions could be read to

COMPLAINT - 60

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

include. Nor has Congress delegated to Defendants the authority to attach any of the Challenged DHS Conditions unilaterally.

175.    Congress likewise did not authorize Defendants to condition federal funding on recipients' conduct under programs that Defendants do not operate (e.g., non-federally funded programs).

176.    By imposing the Challenged DHS Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without constitutional authorization from Congress and in the absence of statutory authority to do so.

177.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

178.    Here, Defendants seek to impose conditions that purport to require compliance with the law as interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

179.    Moreover, Congress has not authorized Defendants to unilaterally terminate grants for "convenience." Where Congress has appropriated funds and directed that they be spent on a particular objective, the agency cannot simply substitute its own policy objectives or other reasons, defined as "convenience," to terminate already-awarded grants without violating separation of powers. *See Metro Transp. Auth.*, 2026 WL 588117, at *56 (agency not authorized to terminate grant at will where authorizing statute did not provide such authority).

180.    By requiring grant recipients to agree to the Termination for Convenience Provisions, Defendants are unilaterally seizing authority to terminate federal funding at-will without constitutional authorization from Congress and in the absence of statutory authority to do

COMPLAINT - 61

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

so. The Termination for Convenience Provisions (and any materially similar provisions) violate the separation of powers because they allow Defendants to terminate Salem's grants even where Congress has directed funds to be spent on particular disaster recovery or grant programs or where the agency substitutes its own "agency priorities" for the objectives Congress identified when appropriating the funds.

181.    For these reasons, Defendants' conditioning of Salem's federal grants on compliance with the Challenged DHS Conditions and acceptance of the Termination for Convenience Provisions violates the constitutional separation of powers.

182.    Defendants' violations have caused harm and will continue to cause harm to Salem for which no remedy other than an injunction is adequate.

**Count 2: Ultra Vires Agency Action Not Authorized by Congress**

***Challenged DHS Conditions and Termination for Convenience Provisions;***

***Against All Defendants***

183.    Salem re-alleges and incorporates the above as if set forth fully herein.

184.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

185.    Defendants' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly . . . what they do is ultra vires." *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013).

186.    Defendants lack the statutory authority to impose the Challenged DHS Conditions and Termination for Convenience Provisions. No provision of the relevant authorizing statutes gives Defendants the power to impose these terms, and the statutes authorizing Defendants to administer certain specific grants also preclude their imposition.

COMPLAINT - 62

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

187.    In imposing the Challenged DHS Conditions and Termination for Convenience Provisions, Defendants exceed the statutory authority granted to them by Congress. The Challenged DHS Conditions and Termination for Convenience Provisions are therefore ultra vires executive agency actions.

188.    The Challenged DHS Conditions and Termination for Convenience Provisions have caused harm and will continue to cause harm to Salem, its residents, and surrounding communities, not in the least by forcing Salem to choose between accepting the Challenged DHS Conditions and Termination for Convenience Provisions or forgoing critical disaster relief and mitigation funding.

189.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 326–27 (2015). The Supreme Court allows equitable relief against federal officials who act "beyond those limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

**Count 3: Spending Clause**

***Challenged DHS Conditions and Termination for Convenience Provisions;***

***Against All Defendants***

190.    Salem re-alleges and incorporates the above as if set forth fully herein.

191.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

COMPLAINT - 63

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

192. As described above, Defendants violate the separation of powers because the Challenged DHS Conditions and Termination for Convenience Provisions are neither expressly nor impliedly authorized by Congress. For the same reasons, Defendants violate the Spending Clause as well.

193. The Spending Clause also requires grant recipients to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst*, 451 U.S. at 17, 25. The grant conditions must be set forth "unambiguously." *Arlington*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" recipients "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

194. Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

195. Finally, federal funds "may not be used to induce the states to engage in activities that would themselves be unconstitutional." *Id.* at 210.

196. Even if Congress had delegated authority to the Executive or Defendants to condition DHS grant funding on terms prohibiting all kinds of DEI, facilitating federal civil immigration enforcement, prohibiting the "promot[ion]" of "gender ideology," or adherence to current and future executive orders, the Challenged DHS Conditions would nonetheless be unlawful and unenforceable because, in contravention of the spending power, they are ambiguous, purport to bind grant recipients to post-acceptance and retroactive conditions, are not germane to the purposes of the statutes that authorize DHS grant programs, and may require recipients to engage in actions that are themselves unconstitutional. Each of these flaws applies to each of the Challenged DHS Conditions.

COMPLAINT - 64

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

197.    Even if Congress had delegated authority to the Executive or Defendants to require that DHS grant funding recipients agree that grants may be terminated for "convenience," including for post-award changes in agency priorities, the Termination for Convenience Provisions (and any materially similar provisions) violate the Spending Clause because they do not provide notice of or, on their face, set any applicable limits on, the reasons for which Defendants may terminate Salem's grants.

198.    Defendants' violations have caused harm and will continue to cause harm to Salem for which no remedy other than an injunction is adequate.

**Count 4: Administrative Procedure Act, Arbitrary and Capricious**

*Challenged DHS Conditions and Termination for Convenience Provisions;*

*Against DHS and FEMA*

199.    Salem re-alleges and incorporates the above as if set forth fully herein.

200.    DHS and FEMA are "agenc[ies]" as defined in the APA. 5 U.S.C. § 701(b)(1).

201.    Final agency actions (1) "mark the consummation of the agency's decision-making process" and (2) are ones "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation omitted).

202.    The FY25 DHS Standard Terms, FY26 DHS Standard Terms, and BRIC NOFO are final agency actions of DHS and FEMA because they reflect final decisions—in accord with presidential directives—to require grant recipients and subrecipients to comply with various Trump Administration policy priorities as a condition to receiving federal funds. *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and

COMPLAINT - 65

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

"opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Cnty. of Santa Clara*, 815 F. Supp. 3d at 1037–38 (N.D. Cal. 2025) (same; compiling cases).

203.    Defendants' adoption of the Termination for Convenience Provisions in the FY26 DHS Standard Terms and the BRIC NOFO are final agency actions under the APA. Defendants' incorporation of the Termination for Convenience Provisions or materially similar terms into each new NOFO are final agency actions under the APA.

204.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

205.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293 (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43).

206.    Defendants have provided no reasoned explanation or basis for their decision to impose the Challenged DHS Conditions on funds that Congress has appropriated for disaster relief and mitigation grant programs that have no reasonable connection to or nexus with those Conditions.

COMPLAINT - 66

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

207. Defendants have provided no reasoned explanation or basis for withholding funds Congress appropriated for disbursement.

208. Defendants have provided no reasoned explanation or basis for their decision to impose the Termination for Convenience Provisions through the FY26 DHS Standard Terms or the BRIC NOFO, or any terms materially similar to the Termination for Convenience Provisions, on funds that Congress has appropriated for disbursement for specific purposes.

209. In imposing these new termination provisions, Defendants have contravened the OMB grant guidance and regulations, adopted by DHS in 2014, which do not permit termination for convenience, termination for changes in agency priorities after the time of the award, or termination where the agency is substituting its priorities for those identified by Congress.

210. Defendants have ignored essential aspects of the "problem" they purport to address by taking the final agency actions described above, including by failing to (a) assess the extent to which the Challenged DHS Conditions and Termination for Convenience Provisions (or any materially similar provisions) are lawful and consistent with statutes and the Constitution, (b) consider Salem's reasonable and inevitable reliance on now at-risk funds, including already-awarded funds potentially at risk of termination based on agency whim at any time after the award and for reasons unknown at the time of the award, and (c) consider the potential impacts on safety and emergency management of withholding or terminating, without cause, the funding appropriated by Congress.

211. Salem therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the Challenged DHS Conditions and Termination for Convenience Provisions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the

COMPLAINT - 67

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Challenged DHS Conditions and Termination for Convenience Provisions (or materially similar provisions) without complying with the APA.

212.    Defendants' violations have caused harm and will continue to cause harm to Salem for which no remedy other than an injunction is adequate.

## Count 5: Administrative Procedure Act, Contrary to the Constitution

### *Challenged DHS Conditions and Termination for Convenience Provisions;*

### *Against DHS and FEMA*

213.    Salem re-alleges and incorporates the above as if set forth fully herein.

214.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

215.    As described above, the imposition by DHS and FEMA of the Challenged DHS Conditions and Termination for Convenience Provisions (and any materially similar provisions) violates bedrock constitutional provisions and principles including the separation of powers between the President and Congress, and the Spending Clause.

216.    Salem therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the Challenged DHS Conditions and Termination for Convenience Provisions violates the APA because it is contrary to constitutional right, power, privilege, or immunity; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the Challenged DHS Conditions and Termination for Convenience Provisions (and any materially similar provisions) without complying with the APA.

217.    Defendants' violations have caused harm and will continue to cause harm to Salem for which no remedy other than an injunction is adequate.

COMPLAINT - 68

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

**Count 6: Administrative Procedure Act, In Excess of Statutory Authority**

*Challenged DHS Conditions and Termination for Convenience Provisions;*

*Against DHS and FEMA*

218. Salem re-alleges and incorporates the above as if set forth fully herein.

219. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

220. Defendants may exercise only authority granted to them by statute or the Constitution.

221. No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds. The Challenged DHS Conditions are not authorized by any statute under which any of the grant programs at issue exist, nor under any other statute.

222. No law or provision of the Constitution authorizes Defendants to terminate Salem's grants for convenience.

223. The Termination for Convenience Provisions (and any materially similar provisions) exceed and are contrary to the meaning of 2 C.F.R. § 200.340, a prior version of which was adopted by DHS and governs termination of DHS grants. Section 200.340(a)(4) authorizes grant terminations only if the grant itself no longer effectuates "agency priorities" identified at the time of the federal award, and only to the extent permitted by law. The regulatory provision does not independently permit or authorize grant terminations based on changed agency priorities identified after the time of the federal award or on the basis of convenience. No other applicable regulatory provision authorizes termination for convenience.

COMPLAINT - 69

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON 98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

224.    Salem therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the Challenged DHS Conditions and Termination for Convenience Provisions violates the APA because it is not in accordance with law and/or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the Challenged DHS Conditions and Termination for Convenience Provisions (and any materially similar provisions) without complying with the APA.

225.    Defendants' violations have caused harm and will continue to cause harm to Salem for which no remedy other than an injunction is adequate.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Salem requests the following relief:

A.    A declaration that the Challenged DHS Conditions and Termination for Convenience Provisions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.    A preliminary and permanent injunction enjoining Defendants from imposing or enforcing the Challenged DHS Conditions and Termination for Convenience Provisions, or any materially similar terms or conditions, with respect to any DHS or FEMA grant applications submitted by, or DHS or FEMA grant funds received by or awarded to, whether directly or indirectly, Salem;

C.    A preliminary and permanent injunction enjoining Defendants from imposing or enforcing any interpretation of the Civil Rights Conditions against Salem as requiring anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the judiciary;

COMPLAINT - 70

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

D.  A preliminarily and permanent injunction enjoining Defendants from retaliating against Salem for participating in this lawsuit or taking any adverse action based on any Salem's participation in this lawsuit, including but not limited to reducing the amount of a grant award to Salem; refusing to issue, process, or sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

E.  An award of to Salem of its reasonable attorney's fees and costs; and

F.  Any other further relief that the Court deems fit and proper.

DATED this 30th day of June, 2026.

PACIFICA LAW GROUP LLP

*/s/ Stacey H. Crawshaw*
Stacey H. Crawshaw, OSB #146074
Paul J. Lawrence*
Jamie Lisagor*
Carly Zipper*
401 Union St., Suite 1600
Seattle, WA 98101-2668
(206) 245-1700
Stacey.Lewis@pacificalawgroup.com
Paul.Lawrence@pacificalawgroup.com
Jamie.Lisagor@pacificalawgroup.com
Carly.Zipper@pacificalawgroup.com

Thomas Cupani, OSB # 924654
City of Salem, Legal Department
555 Liberty St. SE, Room 225
Salem, OR 97301-3513
(503) 588-6395
TCupani@cityofsalem.net

*Attorneys for Plaintiff City of Salem*

*\* Pro Hac Vice application forthcoming*

COMPLAINT - 71

PACIFICA LAW GROUP LLP
401 UNION ST.
SUITE 1600
SEATTLE, WASHINGTON  98101-2668
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750