IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CITY OF SALEM,

Plaintiff,

vs.

MARKWAYNE MULLIN, *in his official capacity as Secretary of the United States Department of Homeland Security*, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ROBERT J. FENTON, JR., *in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency*, and FEDERAL EMERGENCY MANAGEMENT AGENCY,

Defendants.

Case No. 6:26-cv-01340-MC

OPINION and ORDER

---

MCSHANE, J.:

One of the key roles of the federal government is to provide communities with the tools to recover from and to mitigate natural disasters. Yet, as wildfires, severe storms, and floods routinely ravage through the State of Oregon, disaster relief has become a tool to advance unrelated executive policy. Although it is hard to imagine the connection between the use of preferred pronouns and the fires currently burning through central Oregon, Defendants (United States

agencies and their senior officials) have announced new conditions for federal disaster-related funding. Specifically, they seek to prohibit the promotion of "gender ideology," diversity, equity, inclusion, and more.[1]

Plaintiff City of Salem seeks to enjoin Defendants from imposing what they characterize as arbitrary and impermissible conditions on grants that are needed to address natural disasters. Defendants argue that this Court lacks jurisdiction over Salem's claims and, alternatively, that Salem fails to establish a likelihood of any constitutional or statutory violation.

Because Salem establishes a strong likelihood of success on the merits of its claims, that they risk irreparable harm absent an injunction, and that the balance of equities sharply tilts in its favor, its Motion for Preliminary Injunction, ECF No. 14, is GRANTED.

## BACKGROUND[2]

Salem is a charter city and municipality existing under the constitution and laws of the State of Oregon and the Salem City Charter. Compl. 4, ECF No. 1. As a sub-recipient from the State of Oregon, Salem regularly relies on federal funding from Defendant Department of Homeland Security ("DHS") to support most of its emergency-management functions. Compl. 7. Salem has received or been awarded, or anticipates applying for, grants from DHS' Public Assistance Program ("PA"), Building Resilient Infrastructure and Communities Program

[1] Nowhere in the briefings, the regulations, or the executive orders does the government attempt to define "gender ideology" or DEI in any helpful way.

[2] Salem requests judicial notice of multiple documents in support of its Motion for a Preliminary Injunction. See Request for Judicial Notice ("RJN"), ECF No. 15. Salem's request is GRANTED. A court may take judicial notice of any "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Civ. P. 201(b); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). "Matters of public record" and "official acts taken by the executive branch" are permissible. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *see also Patrap v. Wells Fargo Bank, N.A.*, 63 F. Supp. 3d 1101, 1104 n.1 (N.D. Cal. 2014).

(“BRIC”), and Emergency Management Performance Grant Program (“EMPG”) for the current funding cycles.

In response to a flurry of executive orders, DHS changed the conditions for these disaster-related grants in recent funding cycles. Salem alleges it must now decide in the immediate future whether to execute a DHS grant agreement subject to the contested terms. Mot. 14, ECF No. 14. In advance of this deadline, Salem filed a Motion for Preliminary Injunction asking this Court to enjoin DHS from imposing the conditions. On August 13, 2026, this Court held oral argument on the Motion and granted Salem’s request for a preliminary injunction. After summarizing the relevant grant programs, executive orders, and grant terms, this Court explains why Salem’s requested injunction is warranted.

**Federal Funding for Disaster Preparedness, Mitigation, and Recovery**

In 1979, an executive order established the Federal Emergency Management Agency (“FEMA”) as the central independent agency for emergency preparedness, mitigation, and response activities. Compl. 5; *see* Exec. Ord. No. 12127, 44 Fed. Reg. 19367 (Mar. 31, 1979). The Disaster Relief and Emergency Assistance Amendments of 1988 expanded FEMA’s responsibilities, and the Disaster Relief Act of 1974 was renamed the Robert T. Stafford Disaster Relief and Emergency Assistance Act (“Stafford Act”). Compl. 5. The Stafford Act authorizes federal funding to state, local, tribal, and territorial governments to “help communities quickly respond to and recover from presidentially-declared disasters and emergencies.” Compl. 7.

The Homeland Security Act of 2002 established the Department of Homeland Security (“DHS”). Compl. 6; *See* Pub. L. 107-296, 116 Stat. 2135 (2002); *see also* 6 U.S.C. § 111. The 2002 Act also established FEMA as a component agency of the DHS. Compl. 6. FEMA’s primary purpose is to “reduce the loss of life and property and protect the Nation from all hazards, including

natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C. § 313(a), (b)(1).

Congress appropriates billions of dollars annually for DHS to distribute to states and local governments for disaster preparedness, mitigation, and recovery efforts. Compl. 6. DHS administers competitive and entitlement grant programs. Compl. 6. Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. Compl. 6 (quoting *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019)). Entitlement grants "are awarded pursuant to a statutory formula" wherein "congress determines who the recipients are and how much money each shall receive." Compl. 6 (quoting *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up)). Three DHS grant programs to advance that goal are relevant here: (1) the PA Grant Program; (2) the BRIC Program; and the (3) EMPG Program.

**Grant Programs**

1. **Public Assistance Grant Program**

Through the Congressionally appropriated Disaster Relief Fund, FEMA can "direct, coordinate, manage, and fund eligible resources and recovery efforts associated with domestic major disasters and emergencies pursuant to the Stafford Act." Compl. 10. The PA Grant Program is paid out from the Disaster Relief Fund. Compl. 10. The PA Grant Program provides "supplemental federal grant assistance for debris removal, life-saving emergency protective measures, and restoration of certain disaster-damaged facilities." Compl. 8. The Program also aids with hazard mitigation efforts. Compl. 8. The President must first declare a major disaster or emergency before FEMA may provide PA funding to states. Compl. 8.

FEMA promulgates rules governing PA grants, including defining eligibility. Compl. 8. As one example, FEMA requires PA grant recipients to comply with 44 C.F.R. part 7, "Nondiscrimination in Federally-Assisted Programs." Compl. 9. The regulation effectuates Title VI of the Civil Rights Act of 1964. *See* 44 C.F.R. § 206.11.

In December 2025, several severe storms in Western Oregon delivered "record rainfall, high winds, and an atmospheric river that caused widespread flooding, landslides, and mudslides." Compl. 10. At times, more than 300,000 Oregonians were without power, and some areas lacked power for more than four days. Compl. 11. Oregon Governor Tina Kotek declared a state of emergency, requested a federal emergency declaration, and asked FEMA for relief funding. Compl. 10–11. On April 11, 2026, President Trump and FEMA approved Governor Kotek's request. Compl. 11. As a result, PA grant funding was made available "for emergency work and the repair and replacement of facilities damaged by the severe storms, straight-line winds, flooding, landslides and mudslides in Clackamas, Hood River, Lane, Lincoln, Linn, Polk, Tillamook, Union and Yamhill counties." Compl. 11.

The December 2025 storms caused substantial damage to a roadway in Salem that provides access to the West Salem Pump Station. Compl. 12. The Station "transmits sewage from all of West Salem beneath the Willamette River to the Willow Lake Wastewater Pollution Control Facility—Salem's primary wastewater treatment facility." Compl. 12. On May 4, 2026, Salem requested PA grant funding to repair access to the Facility. Compl. 12. On May 26, 2026, Oregon's Department of Emergency Management alerted Salem that its request was approved. Compl. 12. After executing a Grant Agreement, Salem would gain access to $1,093,800 in federal funds to complete the project. Compl. 12.

The PA Grant Agreement incorporates the Fiscal Year ("FY") 2025 DHS Standard Terms and Conditions ("FY25 DHS Standard Terms"). Compl. 13. As described in more detail below, the FY25 DHS Standard Terms include conditions prohibiting "all kinds of DEI, prohibiting the 'promot[ion]' of 'gender ideology,' and adherence to executive orders unrelated to the purpose of the grant[.]" Compl. 13–14.

**2. Building Resilient Infrastructure and Communities Grant Program**

FEMA's Hazard Mitigation Assistance Program ("HMA") offers funding to state, local, tribal, and territorial governments to reduce and mitigate the impact of future natural disasters. Compl. 14.[3] HMA consists of multiple grant opportunities, including the BRIC program. Compl. 14. FEMA utilized its authority under the Disaster Recovery Reform Act of 2018 to create the BRIC program.[4] Compl. 14. BRIC funding "must" be principally used to "implement predisaster hazard mitigation measures that are cost-effective and are described in proposals approved by [FEMA.]" 42 U.S.C. § 5133(e)(1). Several sources of Congressional appropriations fund the BRIC grant program. Compl. 16.

FEMA awards BRIC funding on a "competitive basis for mitigation activities that are cost effective and in accordance with" criteria established by Congress. Compl. 15 (quoting 42 U.S.C. § 5133(f)(1). Some examples of the considered criteria include: "the extent to which a proposed project will mitigate damage from natural disasters, its cost-effectiveness, the applicant's commitment to spending its own funds on disaster mitigation, and the extent to which the project 'maximize[s] net benefits to society.'" Compl. 15 (quoting 42 U.S.C. §§ 5133(g)).

---

[3] Local governments apply for HMA funding as sub-applicants of their state. Compl. 14.

[4] The Disaster Recovery Reform Act of 2018 authorizes FMA to "provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments." 42 U.S.C. § 5133(b); FEMA, Hazard Mitigation Assistance: Building Resilient Infrastructure and Communities, 87 Fed. Reg. 10805 (2022); Compl. 14.

To administer the BRIC program, FEMA issues a notice of funding opportunity ("NOFO"). Compl. 17. The NOFO details the total amount of available funding in a given year, "the criteria the agency will apply in selecting projects, and the application instructions." Compl. 17. Every project must be "cost-effective." 42 U.S.C. § 5133(e)(1)(A). States and their sub-applicants, like Salem, often take months or years preparing to apply for BRIC funding. Compl. 19.

On March 26, 2026, FEMA posted the Fiscal Year 2024 and 2025 BRIC NOFO. Compl. 17. The 2025 NOFO states recipients "must comply with the requirements of Presidential Executive Orders related to grants … the full text of which are incorporated by reference." Compl. 17. Moreover, the BRIC NOFO states recipients must comply with FY25 DHS Standard Terms, including "conditions related to prohibiting all kinds of DEI, prohibiting the 'promot[ion]' of 'gender ideology,' or adherence to executive orders unrelated to the purpose of the grant . . . [and] conditions related to facilitating federal immigration enforcement." Compl. 18. The BRIC NOFO includes a termination provision ("Termination Condition") allowing FEMA to cancel, in its sole discretion, the award in whole or in part if the "federal award no longer effectuates the program goals or agency priorities." Compl. 18–19.[5]

Salem intends to apply for a BRIC grant—pursuant to the NOFO—to "replace the sole bridge that provides access to the Green Island Water Treatment Plant." Compl. 20. The Green Island Water Treatment Plant is Salem's source of clean drinking water. Compl. 20. The existing bridge to the island "does not meet current strength or seismic standards and will not pass adequate flow in flood conditions." Compl. 18.

///

///

[5] The BRIC Termination Provision provides for other avenues for FEMA to terminate an award in whole or in part as well. See Compl. 18–19.

**3. Emergency Management Performance Grant Program**

The EMPG Program "supports state and local governments' emergency management by funding planning, organization, equipment, training, exercises, and personnel to prepare for hazards, including natural disasters." Mot. 4, ECF No. 17. The Program distributes grants by statutory formula. Mot. 4.

**Executive Orders**

Since early 2025, President Trump has issued executive orders impacting the PA, BRIC, and EMPG grant programs. On January 20, 2025, President Trump issued an executive order labeled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Ord. No. 14168 § 3(e), (g), 90 Fed. Reg. 8616 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology Order directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and grantee preferences" to "ensure grant funds to not promote gender ideology." *Id*. Additionally, the Gender Ideology Order states: "[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id*. § 2(f).

On January 21, 2025, President Trump issued an executive order directing agencies to include "in every … grant award" a condition that a recipient "certify that it does not operate any programs promoting DEI" that violate federal civil rights law. Exec. Ord. No. 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The DEI Order does not define "DEI" or "DEIA." Additionally, the DEI Order commands agencies to include a funding term requiring recipients to agree that their compliance "in all respects" with applicable federal anti-

discrimination laws is "material to the government's payment decisions" for False Claims Act purposes. *Id*.[6]

On January 29, 2025, President Trump issued yet another executive order. The "Ending Radical Indoctrination in K-12 Schooling" Order directs agencies to develop an "Ending Indoctrination Strategy" to combat "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology." Exec. Ord. No. 14190 § 3, 90 Fed. Reg. 8853 (Jan. 29, 2025) (the "Radical Indoctrination Order").[7]

**Challenged Conditions**

DHS implemented President Trump's executive orders by updating the standard terms and conditions ("Standard Terms") of its disaster relief grant programs. Mot. 5. Specifically, the FY25 Standard Terms contain two provisions relevant here: the FY25 Discrimination Condition and Executive Order Condition. Mot. 5. The FY26 Standard Terms incorporate both Conditions, as well as a Termination Condition. Mot. 5. DHS "incorporated the same or materially similar conditions into the current BRIC NOFO and the FY25 and FY26 EMPG NOFOs." Mot. 5. The Court explains each Condition, referred to collectively as the "Challenged Conditions," in turn.

**I. Discrimination Condition**

Under the Discrimination Condition, recipients must certify they "do not, and will not, … operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Mot. 5; RJN, Ex. 1 § C.XVII(2)(a)(i); Ex. 2 at 10.

---

[6] The False Claim Act imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The misrepresentation must be "material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). A violation is punishable by a civil penalty and mandatory treble damages sustained by the Government. 31 U.S.C. § 3729(a); *see also* 28 C.F.R. § 85.5(a).

[7] The Radical Indoctrination Order attempts to define "[d]iscriminatory equity ideology" as follows: "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations[.]" Exec. Ord. No. 14190 § 2(b), 90 Fed. Reg. 8853. The definition lists eight examples, all mostly connected to race, color, sex, or national origin. *Id*.; *see* Compl. 23.

"DEI" is defined only as "diversity, equity, and inclusion" and "DEIA" as "diversity, equity, inclusion, and accessibility." *Id.*, Ex. 1 § C.XVII(1)(a)–(b). Meanwhile, "discriminatory equity ideology" is defined by incorporating the Ending Radical Indoctrination in K-12 Schooling Order, which defines it as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations[.]" *Id.* § C.XVII(1)(c) (citing Exec. Order No. 14190 § 2(b), 90 Fed. Reg. 8853 (Jan. 29, 2025)).

The Discrimination Condition mandates recipients agree that "compliance in all respects with all applicable Federal anti-discrimination laws is material to the [federal] government's payment decisions" for purposes of the False Claims Act. Mot. 6. If the DHS Secretary finds that a grant recipient violated the Discrimination Condition, the Standard Terms authorize DHS to "suspend payments, terminate an award, and seek repayment of all federal funds." Mot. 6–7; RJN, Ex. 1 § C.XVII(3), Ex. 2 at 10.

## II. Executive Order Condition

The FY 25 Standard Terms also include the Executive Order Condition, which requires recipients to "comply with the requirements of Presidential Executive Orders related to grants," and incorporates the full extent of their text by reference. Mot. 7; RJN, Ex. 1 § C.XXXI. The FY26 Standard Terms demand compliance with "the requirements *and actions* of Presidential Executive Orders related to grants." *Id.*, Ex. 2 at 17 (emphasis added). The Gender Ideology and DEI Orders are incorporated into the Terms. Mot. 7.

## III. Termination Condition

Lastly, the FY26 Standard Terms authorizes "DHS to terminate a federal award, in whole or in part, '[f]or convenience,' including whenever DHS concludes an award 'no longer advances

agency priorities or the national interest.'" Mot. 7 (quoting RJN, EX. 2 at 16). The FY26 Terms cite the Uniform Guidance, 2 C.F.R. § 200.340 and the Executive Order 14332 as authority. *Id*. at 15–16; Mot. 7. "A materially similar Condition" is embedded in the FY26 EMPG NOFO despite being awarded based on statutory formulae. Mot. 9.

**Trump Administration Actions and Interpretations**

High-ranking officials within the Trump Administration have taken several actions confirming their intent to "investigate recipients, withhold federal funding, and pursue civil and criminal penalties against recipients whose policies conflict with the Administration's views on DEI and gender identity." Mot. 9; Compl. 23.

For example, in February 2025, then-attorney General Pamela Bondi wrote in a memo ("Bondi Memo") to United States Department of Justice employees that the DEI Order "mak[es] clear that policies relating to [DEI] and [DEIA] 'violate the text and spirit of our longstanding Federal civil-rights laws.'" Compl. 24.[8] The Bondi Memo also states that the Department of Justice will "investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities[.]" *Id*.

In a July 29, 2026, memo, former Attorney General Bondi then offered "guidance" for recipients of federal funding on the Trump Administration's view of DEI and DEIA programs (the "Discrimination Guidance Memo"). Compl. 24.[9] The memo lists "unlawful practices that could result in revocation of grant funding," as well as potential "liab[ility] for discrimination" if funding recipients "knowingly fund the unlawful practices of contractors, grantees, and other third parties." *Id*. at 4. In addition to other guidance, the Memo states: "Facially neutral criteria (e.g., "cultural

---

[8] (citing Att'y Gen., Memorandum for all Dep't Employees, Ending Illegal DIE and DEIA Discrimination and Preferences at 1 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline (quoting the DEI Order)).
[9] Att'y Gen., Memorandum for all Federal Agencies, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (Jul. 29, 2026), https://www.justice.gov/ag/media/1409486/dl.

competence," "lived experience," geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id*. at 2.

Lastly, then-Deputy Attorney General Todd Blanche launched a "Civil Rights Fraud Initiative" that will "utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates federal civil rights law." Mot. 9; RJN, Ex. 10 at 2. The letter indicates that recipients engage in "civil rights fraud" by supporting DEI initiatives. *Id*. at 1.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When, as here, the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

## DISCUSSION

Salem alleges that the DHS policy implementing the Challenged Conditions is unlawful under both the Constitution and the Administrative Procedure Act (the "APA"). Specifically, Salem

maintains the Challenged Conditions violate separation of powers and the Spending Clause. Salem then challenges the Challenged Conditions as exceeding statutory authority, contrary to the Constitution, and arbitrary and capricious under the APA.

DHS first argues that the Tucker Act strips this Court of jurisdiction over Salem's claims. In the alternative, DHS argues Salem fails to establish any constitutional or statutory violation.

**Preliminary Issues**

**I. Salem Has Standing**

The Supreme Court has established three requirements for standing under Article III of the U.S. Constitution:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent …. Second, there must be a causal connection between the injury and the conduct complained of … Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted). Here, Salem is "challenging DHS's policy of imposing the Challenged Conditions across its program." Reply 5, ECF No. 28. The Hobson's Choice the policy creates—having to accept unlawful grant conditions or forego millions in critical disaster funding—is an injury sufficient to create standing even though Salem has not been awarded funds yet. *See Melendres v. Arpaio*, 695 F.3d 990, 997–98 (9th Cir. 2012); *see also City of Fresno v. Mullin*, 2026 WL 1998576, at *1, *31 (N.D. Cal. July 9, 2026) (listing similar cases involving grant programs that have found Article III standing was satisfied). Salem satisfies Article III standing.

**II. Salem's Claims Are Not Barred by the Tucker Act**

Preliminarily, DHS argues this Court lacks jurisdiction because the Tucker Act requires this matter to be transferred to the Court of Federal Claims. Resp. 8, ECF No. 26. The Tucker Act

"confers exclusive jurisdiction [over contract claims against the United States] on the Court of Federal Claims." *Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025); 28 U.S.C. § 1491(a)(1). Contract claims are those "concerned solely with rights created within the contractual relationship [that have] nothing to do with duties arising independently of the contract." *North Side Lumber v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied*, 474 U.S. 931 (1985) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). Contract claims are distinguishable from statutory or constitutional claims which merely lead to "an order setting aside an agency's action [and resulting] in the disbursement of funds." *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). District courts, not the Court of Federal Claims, have jurisdiction over such "statutorily or constitutionally based" claims. *Thakur*, 163 F.4th at 1204.

Contract claims that are "disguised" as statutory or constitutional claims remain within the jurisdiction of the Court of Federal Claims. *Id.* For example, claims brought under the Administrative Procedure Act challenging an agency's allegedly "arbitrary and capricious" termination of government contracts are merely contract claims disguised as APA claims. *See California*, 604 U.S. 650 (2025); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025). Therefore, district courts lack jurisdiction over the claims. *Id.* To determine whether a claim is merely "a disguised breach of contract claim," the Court applies the *Megapulse* test. *Thakur*, 163 F.4th at 1204. The *Megapulse* test inquires as to (1) the source of the rights underlying the claims and (2) the type of relief sought. *Id.*

Here, Salem's claims are not contract claims—disguised or otherwise. First, Salem brings *statutory* and *constitutional* challenges to DHS' policy implementing the Challenged Conditions. *See City of Fresno v. Turner*, WL 2721390, at *5 (N.D. Cal. Sep. 23, 2025) (finding the Tucker Act did not apply to similar challenges). Second, Salem seeks injunctive relief preventing enforcement

of the Challenged Conditions linked to the funding, not money damages. *See Thakur v. Trump*, 148 F.4th 1096, 1104 (9th Cir. Aug. 21, 2025) (finding that a plaintiff's request to "return" to the "status quo" and ensure an agency complies with federal law does not constitute seeking performance of a contractual obligation under the Tucker Act.").

Because the sources of the rights underlying Salem's claims are constitutional and statutory, and Salem seeks equitable relief to restore the status quo, Salem's claims are not contract claims subject to the Tucker Act; this Court has jurisdiction.

### III. Salem Challenges a Final Agency Action Under the APA

"[T]wo conditions must be satisfied for agency action to be 'final'" and subject to judicial review: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 US. 154, 177–78 (1997) (citing *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

"Where an agency establishes conditions on grant eligibility, the agency has taken action that 'mark[s] the 'consummation' of the agency's decisionmaking process.'" *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 740 (N.D. Cal. June 18, 2025). Salem therefore meets the first prong of *Bennett*. Because DHS can "deny or terminate grants should plaintiff fail to adhere to their DEI-related requirements[,] Salem also meets the second prong requiring that "legal consequences will flow" from the Challenged Conditions. *Cnt'y of Santa Clara v. Noem*, 815 F.Supp.3d 979, 1037 (N.D. Cal. 2025); *San Francisco Unified Sch. Dist.*, 789 F. Supp. 3d at 740. This Court may review the merits of Salem's APA claim.

///

**Salem is Likely to Succeed on the Merits**

Salem asserts that the Challenge Conditions violate (I) separation of powers; (II) the Spending Clause of the U.S. Constitution, and (III) the APA. Mot. 1. Several district courts have agreed with Salem in similar matters.[10] This Court joins the chorus. Salem demonstrates a likelihood of success on its constitutional and APA claims.

**Constitutional Claims**

**I. Separation of Powers**

"The leading Framers of our Constitution viewed the principle of separation of powers as the central guarantee of a just government." *Freytag v. Comm'r*, 501 U.S. 868, 870 (1991). The Framers accordingly divided power between the three equal branches of government. In doing so, the Constitution explicitly grants the power of the purse to Congress. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Absent congressional authorization, the Executive branch may not redistribute, withhold, or condition "properly appropriated funds in order to effectuate its own policy goals." *Id*. at 1235; *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). An executive agency "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Salem alleges that DHS's action violates separation of powers because "no statute gives DHS the power to impose" the Challenged Conditions. Mot. 17. DHS defends the Challenged Conditions by noting the agencies' general authority to administer grants and to ensure compliance with federal anti-discrimination law. However, the Challenged Conditions *add* requirements to

[10] See *City of Fresno v. Mullin*, 2026 WL 1998576, at *1, *39–40 (N.D. Cal. July 9, 2026); *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1023–43 (N.D. Cal. 2025), *appeal docketed*, No. 26-402 (9th Cir. Jan. 20, 2026); *City of Chicago v. Noem*, 2025 WL 3251222, at *1–2, *10–11 (N.D. Ill. Nov. 21, 2025), *appeal docketed*, No. 26-1103 (7th Cir. Jan. 21, 2026); *King Cnty v. Turner*, 785 F. Supp. 3d 863, 874–75, 893–94 (W.D. Wash. 2025), *appeal docketed*, No. 25-3664 (9th Cir. June 10, 2025); *City of Fresno v. Turner*, 2025 WL 2721390, at *1, *6–19 (N.D. Cal. Sep. 23, 2025); *City of Seattle v. Trump*, 2026 WL 1862024, *1, *8 (W.D. Wash. June 29, 2026).

federal funding beyond what existing federal law requires. *See* Bondi Memo; *see* also Discrimination Guidance Memo. The Challenged Conditions "require recipients to accept the Administration's disputed framing of DEI and 'gender ideology,' to certify compliance with undefined or disputed restrictions, and to agree in advance that compliance 'in all respects' with federal antidiscrimination law is material to the federal payment decisions for purposes of the False Claims Act." *City of Seattle v. Trump*, 2026 WL 1862024, at *8 (W.D. Wash. June 29, 2026) (finding same or similar conditions for a variety of grant programs do more than require compliance with existing federal civil-rights law).

DHS' argument that the Discrimination and EO Conditions simply require compliance with Title VI and nothing more is undermined by the *separate* requirement in the Standard Terms that obligate compliance with Title VI. RJN, Ex. 1 § C.VII; RJN, Ex. 2 at 5. The Conditions and the Title VI compliance requirement must represent separate demands. If the Discrimination and EO Conditions are meant only to highlight the existing requirement that recipients comply with Title VI, then the Conditions would be superfluous. DHS cites no proper source providing it authority to unilaterally impose new conditions on Congressionally appropriated funding. And despite what DHS may suggest, "an agency *regulation* cannot create *statutory* authority; only Congress can do that." *Martin Luther King, Jr. Cnty v. Turner*, 785 F. Supp. 3d 863, 886 (W.D. Wash. June 3, 2025).

In defense, DHS leans on *Dalton v. Specter* to argue that "the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution" is unsupported by precedent. 511 U.S. 462, 472 (1994); Resp. 16. In *Dalton*, the Court denied a separation of powers argument that the President exceeded his statutory authority by closing a naval base. *Id.* at 471. *Dalton* revolved around a statutory framework that gave the President unreviewable discretion to close naval bases. *Id.* at 474–76. The

Court found that "plaintiffs alleging a violation of separation of powers must contend that the Executive acted in the '*absence of any* statutory authority,' not only 'that the President acted in excess of such authority.'" *City of Chicago v. United States Dep't of Homeland Security*, 815 F. Supp. 3d 727, 750 (N.D. Ill. Oct. 31, 2025) (quoting *Dalton*, 511 U.S. at 473).

*Dalton* is inapplicable here because Salem alleges DHS has *no authority*, statutorily or constitutionally, to add new conditions to federal grants without Congressional delegation, not that it acted *in excess* of statutory authority. Repl. 16; *see Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019) (finding *Dalton* did not foreclose a constitutional claim where plaintiffs asserted that "to the extent Defendants did not have statutory authority to reprogram the funds, they acted in violation of constitutional separation of powers principles because Defendants lack any background constitutional authority to appropriate funds—making [the plaintiffs'] claim fundamentally a constitutional one.").

Salem demonstrates a likelihood of success on its separation of powers claim.

**II. Spending Clause**

The Spending Clause of the Constitution grants Congress "broad power … to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). However, Congress' spending power is "subject to several general restrictions." *Dole*, 483 U.S. at 207. Three restrictions are relevant here. First, Congress must use its spending power in pursuit of the general welfare. *Id*. Second, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *Id*. (quoting *Pennhurst State Sch. & Halderman*, 451 U.S. 1, 17 (1981)). Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id*. (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion). Salem alleges that

the Challenged Conditions violate the Spending Clause because they are: (A) vague and (B) unrelated to the purposes of the grant programs. Salem once again demonstrates a likelihood of success on its claim in both respects.

**A. Ambiguity**

Salem alleges that the Challenged Conditions are "so vague, ambiguous, and open-ended that Salem cannot determine what conduct is prohibited or when DHS may terminate its grants." Mot. 21. "When determining the ambiguity of conditions on federal grants, courts evaluate 'whether [a recipient] … would clearly understand … the obligations of the [conditions]." *City of Fresno v. Turner*, 2025 WL 2469330, at *6 (N.D. Cal. Aug. 27, 2025) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 2916 (2006)). As explained below, because the Discrimination Condition, Executive Order Condition, and Termination Condition are "rife with vagueness and ambiguity, leaving grantees to speculate what is proscribed and what is permitted." Salem is likely to be successful on its claim. *San Francisco Unified School Dist.*, 789 F. Supp. 3d at 746; *Pennhurst*, 451 U.S. at 17.

**i. Discrimination Condition**

The Discrimination Condition prohibits "programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." RJN, Ex. 1 § C.XVII(2)(a)(i). "DEI" or "DEIA" are not defined beyond spelling out the acronyms. Mot. 21. These terms can be understood in a myriad of ways. *See, e.g., Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 Supp. 3d 149, 188 (D. N.H. 2025) ("DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice."); *San Francisco Unified School Dist*, 789 F. Supp. 3d at 746, 749 ("DEI" and "equity" limiting conditions "are rife with vagueness and ambiguity, leaving

grantees to speculate what is proscribed and what is permitted[.]"); *City of Fresno*, 2026 WL 1998576, at *10, *24–25 (similar).

It is also unclear what it means to "promote" or "advance" DEI or DEIA, particularly considering the Trump Administrations novel, ever-changing interpretations of anti-discrimination law. *See Santa Clara*, 815 F. Supp. 3d at 1030–35 (explaining how the Trump Administration's Executive Orders and DOJ memoranda fail to clarify what "provide or advance means); *see also* Bondi Memo, RJN, Ex. 12 at 1. Without more clarity, grant recipients are unable to predict how DHS will enforce the Discrimination Condition based on these undefined terms.[11] The Spending Clause does not permit such opaqueness.

**ii. Executive Order Condition**

Salem raises alarm about the ambiguity of the Executive Order Condition as well. The Executive Order Condition demands recipients "comply with the requirements of Presidential Executive Orders related to grants," and incorporates the full texts of the orders by reference. Mot. 7; Ex. 1 § C.XXXI. The Condition "never defines what executive orders are 'related to grants,' explains how recipients are expected to comply with future executive orders that do not yet exist, or identifies which provisions impose obligations on recipients rather than agencies." Mot. 25.

Moreover, the incorporated executive orders contain uncertain language like "promote gender ideology," "advance the President's policy priorities," "promote anti-American values," and "equity-related activities." Mot. 25; Gender Ideology Order § 3(g); Grant Making Order § 4(b)(i)–(ii); Exec. Order No. 14151 § 2(b)(i). Once again, these terms and phrases are

[11] Importantly, the Discrimination Condition "requires recipients to agree that compliance is 'material' to the government's payment decision for False Claims Act purpose." Mot. 24. While not determinative of ambiguity, this Court notes how the consequences for non-compliance with the Discrimination Condition's uncertain terms are severe. *See City of Fresno*, 2026 WL 1998576, at *25 (False Claims Act liability "heightens the constitutional infirmities associated with the [anti-DEI] conditions' ambiguity.") (cleaned up).

impermissibly broad.

The *Santa Clara* court shared concerns about similar conditions:

> Must plaintiffs comply with only those Executive Orders that focus exclusively on grants? Could the President "attach" a sentence at the end of every Executive Order discussing grant funding, thus requiring plaintiffs to adhere to every Order? What if the Executive Orders directly contradict Congress's intent in passing a grant program? Or contain conditions enjoined as unconstitutional? Such questions, even if they do not appear on the face of the EO Condition, raise concerns that render it impermissibly ambiguous.

815 F. Supp. 3d at 1036; *see City of Fresno*, 2026 WL 1998576 (echoing these concerns).

This Court shares these misgivings about the Executive Order Condition here. The extent of the Condition's requirements is undefined, making it impossible for Salem to "voluntarily and knowingly accept[] the terms of the 'contract.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012).

**iii. Termination Condition**

Lastly, Salem argues that the Termination Condition is fatally ambiguous because it "authorizes DHS to terminate grants based on undefined concepts such as 'convenience,' changes or updates to 'agency priorities,' or the 'national interest.'" Mot. 25. As such, the Termination Condition imposes "no meaningful limits on DHS's termination authority and provide[s] recipients no notice of when their grants may be cancelled." Mot. 25.

DHS responds that "there is no constitutional guarantee of clarity in grant or contract criteria, even if these criteria are set by statute or regulation." Resp. 24. In support of this argument for ambiguity, DHS points to *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1989). Resp. 24. In *Finley*, the Supreme Court denied a vagueness challenge to the National Foundation on the Arts and Humanities Act that awarded discretionary grants based on "artistic excellence and artistic merit …. Taking into consideration general standards of decency and respect for the diverse

beliefs and values of the American public[.]" *Id.* at 572; 20 U.S.C. § 954(d)(1). DHS contends that the criteria in *Finley* (e.g., "artistic excellence") is no clearer than the language in the Termination Condition.

Notably, the plaintiffs in *Finley* challenged an agency's implementation of guidance set out *by Congress* to inform the National Endowment of the Arts' discretionary grantmaking process. *Id*. at 576. The conditions in *Finley* were backed by statute. Here, Salem contests the vagueness of the Termination Condition demanded by DHS without support from Congress.

The Termination Condition is too ambiguous. It permits DHS to discontinue grants based on indiscernible terms like "convenience," changes to "agency priorities," or the "national interest." Mot. 25. A recipient agreeing to the Termination Condition would have no clear notice of the extent of the conditions attached to the accepted federal funding. See *Pennhurst*, 451 U.S. at 17–18. A cynical reading of the condition would suggest that the administration could retaliate against a political entity (to the detriment of those in need of relief) while protected by the vagaries of convenience, changing priorities, and national interest.

**B. Relatedness**

Salem continues that the Challenged Conditions violate the Spending Clause because they are "unrelated to disaster response or preparedness" and "undermine the very purpose of the programs at issue." Mot. 26. Congress may only impose conditions on federal funding where they are "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citation omitted); *Dole*, 483 U.S. at 207, 208 (Federal grant conditions must be "reasonably calculated to address th[e] particular …. purpose … for which the funds are expended."). Salem's argument is on point again and likely to be successful on the merits.

In enacting the Stafford Act, Congress stated its intent to "provide an orderly and

continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters." 42 U.S.C § 5121(b). The PA, BRIC, and EMPG grant programs are intended to effectuate that goal. Specifically, the PA Program "funds repairs, restoration, or replacement of public facilities damaged or destroyed by a major disaster." Mot. 26 (citing 42 U.S.C. § 5172(a)). The BRIC Program provides "technical and financial assistance" to implement "predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property[.]" 42 U.S.C. § 5133(b). The EMPG Program funds "local governments in developing emergency management capabilities and carrying out all-hazards emergency preparedness activities." Mot. 26 (citing 6 U.S.C. § 762).

DHS asserts that the Challenged Conditions are related to the purposes of the expenditures because they ensure recipients comply with anti-discrimination law. Resp. 15, 17, 26. However, the Discrimination and Executive Order Conditions ask more from grant recipients than compliance with existing federal law—they demand submission to the Trump Administration's own anti-DEI and "gender ideology" policy agenda. And the Termination Condition is counter to the programs' purposes of providing *orderly* and *reliable* funding to states and local governments. DHS fails to argue any link between the Trump Administration's anti-DEI crusade and helping communities prepare for, respond to, and recover from disasters.

There is simply no nexus between the Challenged Conditions and the grant programs here. As a result, Salem has established that it is likely to succeed on the merits of its Spending Clause claim.

**APA Claim**

Salem next argues that the Challenged Conditions violate the APA. Under the APA, a court

should "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to constitutional right, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5. U.S.C. § 706(2). Salem alleges that the Challenged Conditions offend each of these violations. Mot. 28. Because the Challenged Conditions are (I) contrary to law and in excess of statutory authority; and (II) arbitrary and capricious, Salem is likely to succeed on the merits of its APA claims.

## I. The Challenged Conditions Are Likely Contrary to Law and In Excess of Statutory Authority

Salem first argues that the Challenged Conditions are "in excess of statutory jurisdiction" and "contrary to constitutional right," thus violating the APA. Mot. 29 (citing 5 U.S.C. § 706(2)(A) – (C)). Specifically, Salem contends that the Challenged Conditions violate separation of powers and the Spending Clause. *Id*. For the reasons explained above, this Court agrees.

## II. The Challenged Conditions Are Arbitrary and Capricious

An agency must offer "a satisfactory explanation for its action[.]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. "When an agency rescinds a 'longstanding' position, it must consider any 'serious reliance interests' it may have engendered, 'determine whether they [are] significant, and weigh [them] against competing policy concerns.'" *Am. Assn. of Univ. Profs. v. Trump*, 815 F. Supp. 3d 907, 972 (N.D. Cal. Nov. 14, 2025) (quoting *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020)). An agency may not rely on

post hoc rationalizations for its actions. *Id*.

Salem is likely to succeed on its claim that the Challenged Conditions are arbitrary and capricious. The policy to implement the Challenged Conditions is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). DHS has made no meaningful explanation of how the Challenged Conditions relate to grant programs appropriated by Congress to fund disaster relief, preparedness, and mitigation. It is entirely unclear how, in any scenario, the Discrimination Condition and Executive Order Condition—both unapologetic attacks on DEI efforts, untethered from existing federal anti-discrimination laws—could promote disaster relief and mitigation. And the Termination for Convenience Condition is likely to only harm disaster relief and mitigation by fostering greater uncertainty in funding for such projects. How are states and local governments expected to prepare for the ever-increasing frequency of natural disasters when their federal funding can be terminated based on the shifting priorities of a president? This is counter to the intent of Congress when it provided for the relief funding.

DHS counters by emphasizing that the APA's arbitrary and capricious standard is "deferential[,] and that an agency must simply "act[] within a zone of reasonableness." Resp. 29 (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). But defining a zone as large does not necessarily make it reasonable.

DHS also argues that the Discrimination and Executive Order Conditions are not new grant requirements. According to DHS, "[a]lthough both conditions have been worded differently in the past, DHS has long required recipients to comply with all anti-discrimination laws[.]" Resp. 30. Defendant's response is not a reasonable explanation for its agency action, however. *Encino Motocars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The Challenged Conditions plainly represent an unexplained expansion of the conditions imposed on recipients beyond what was required in

previous years.

Further, DHS plainly did not consider or appreciate the interests of grant recipients who, like Salem, rely on these funds. If DHS wishes to alter longstanding funding conditions, it may not ignore Salem's serious reliance interests. *Regents of the Univ. of Cal.*, 591 U.S. at 30. To do so is arbitrary and capricious under the APA. *Id*. In past years, Salem accepted PA, BRIC, and EMPG funds subject to the previous standard terms and conditions. Mot. 31; Hutchinson Decl. ¶ 26–29. Salem's disaster preparedness and mitigation budget planning relies on access to these grants. Mot. 31. DHS does not sufficiently explain how—or if—it considered Salem's longstanding reliance interest in "its settled expectation of receiving congressionally authorized grant funding for essential disaster management and recovery programs" when "such funding has never been contingent on compliance with" the Challenged Conditions. Repl. 28.

Salem meets its burden of demonstrating a likelihood of success on its claims that the Challenged Conditions are arbitrary and capricious. *See City of Seattle*, 2026 WL 1862024, at *9 (finding similar).

**Irreparable Harm**

Salem maintains that, absent a preliminary injunction, it will suffer irreparable harm because it must "accept unlawful Challenged Conditions or forego federal funding earmarked for a vital public project." Mot. 31; Martin Decl. ¶ 4; *Winter*, 555 U.S. at 20 (holding a plaintiff seeking preliminary injunction must establish they will suffer irreparable harm without an injunction). The deprivation of constitutional rights constitutes irreparable injury. *Hernandez v Sessions*, 872 F.3d 976, 994 (9th Cir. 2017). Because the Challenged Conditions likely violate Salem's constitutional rights, Salem adequately alleges a likelihood of irreparable injury.

Salem further establishes a risk of irreparable harm in the form of budget uncertainty. *See*

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d. 497, 537 (N.D. Cal. 2017) ("Without clarification regarding the [executive order's] scope or legality, the Counties will be obligated to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services. These mitigating steps will cause the Counties irreparable harm.") *aff'd sub. nom., City &County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018). Declining the federal funds due to the Challenged conditions would force Salem to "divert scarce local resources to replace lost federal funding." Mot. 33; Leinenbach Decl. ¶ 6–15. The gap in expected funding for crucial disaster resilience efforts may likely affect Salem's budget reserves as well. *Id*. at ¶ 13. This fiscal "uncertainty … interferes with [Salem's] ability to budget, plan for the future, and properly serve [its] residents." Mot. 33 (quoting *City of Fresno*, 2025 WL 2721390, at *19 (cleaned up)). Moreover, the "threat to withhold funding causes [Salem] irreparable injury in the form of budgetary uncertainty, deprivation of constitutional rights, and undermining trust between [Salem] and the communities [it] serve[s]." *City of San Francisco v. Trump*, 779 F. Supp 3d 1077, 1082 (N.D. Cal 2025).

Salem adequately alleges it will likely experience irreparable harm unless this Court grants its request for a preliminary injunction in their favor.

**Balance of Equities**

Finally, Salem must "establish … that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These factors merge when the federal government is a party. *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020); *see Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Salem has established that the balance of equities tips in its favor and that an injunction is in the public interest.

First, it is in the public interest to avoid violations of Salem's constitutional rights during the pendency of the litigation. *See Melendres v. Apraio*, 659 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (cleaned up)). Second, there is tremendous public interest in "giving [Salem] the budgetary clarity needed to deliver key public services to [its] constituents." *City of Fresno*, 2025 WL 2721390, at *19. Third, the public has a compelling interest in Salem accessing funding for disaster preparedness and mitigation efforts. Fourth, without the preliminary injunction, Salem may need to divert public funds from other sources to the disaster-response projects identified here.[12]

The balance of equities and public interest strongly weigh in favor of Salem's request for injunctive relief.

**Bond**

DHS requests that any injunctive relief should be accompanied by a bond. Resp. 34 (citing Fed. R. Civ. P. 65(c)). District courts have discretion to set the amount of security they see fit under Fed. R. Civ. P. 65(c). *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009); *see also Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). That amount may be zero where "there is no realistic likelihood of harm to the defendant." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, the Court declines to impose bond because DHS failed to submit compelling evidence to rebut Salem's claims and show a realistic likelihood of harm.

**Remedy**

For the foregoing reasons and for good cause shown, the Court hereby ORDERS:

---

[12] Defendant retorts that granting the injunction harms the public interest by "requiring the payment of money that the government may never recover." Resp. 33. However, since Salem is likely to succeed on the merits of its APA claim, this risk cuts in favor of Salem.

(1) Defendants and their officers, agents, servants, employees, and attorneys, and any other persons in participation with them, are enjoined from:

a. Imposing or enforcing the Challenged Conditions, or any materially similar terms or conditions with respect to any grants awarded to Plaintiff;

b. Requiring Plaintiff to make any "certification" or other representation related to compliance with such terms or conditions; or

c. Refusing to issue, process, sign grant agreements, or retaliating in any way based on Plaintiff's participation in this lawsuit.

(2) Within two (2) days of this Order, Defendants shall serve and file a declaration(s) verifying that (a) Plaintiff is not subject to the Challenged Conditions; and (b) they have complied with this Order.

(3) The Preliminary Injunction shall remain in effect pending further orders from this Court.

## CONCLUSION

For the foregoing reasons, Salem's Motion for Preliminary Injunction, ECF No. 14, is GRANTED as set above.

IT IS SO ORDERED.

DATED this 20th day of August 2026.

/s/ Michael McShane
Michael McShane
United States District Judge